Louis KASPER, Chairman, City of Chicago Republican Party; Donald L. Totten, Chairman, Cook County Republican Party; Denise Barnes, Aldermanic Candidate for the 42nd Ward; City of Chicago Republican Party; and, Cook County Republican Party, Plaintiffs,

v.

Congressman Charles A. HAYES; Barbara Bowman; Barbara Delaney; Dr. Marjorie Joyner; American Federation of State County and Municipal Employees, AFL–CIO (Illinois Public Employees Council 31); Coalition of Black Trade Unionists; Illinois Public Action Council; IVI–IPO; Kenwood-Oakland Community Organization; Midwest Community Council; Midwest Voter Education and Research Project; National Organization for Women, Chicago Chapter; Operation Push; Por Un Barrio Mejor; and Task Force for Black Political Empowerment, Intervenors-Plaintiffs,

v.

BOARD OF ELECTION COMMISSIONERS OF CHICAGO; Michael E. Lavelle; James R. Nolan; and Nikki M. Zollar, as members of said Board, Defendants.

No. 87 C 435.

United States District Court,
N.D. Illinois, E.D.

Jan. 23, 1987.

Affirmed, 7th Cir., 814 F.2d 332.

Dan K. Webb, Cristofer E. Lord, Jerome W. Pope, Winston & Strawn, Chicago, Ill., for plaintiffs.

Charles M. Biggam, Jr. Chicago, Ill., for defendants.

## MEMORANDUM OPINION AND ORDER

BRIAN BARNETT DUFF, District Judge.

Plaintiffs in this action for declaratory and injunctive relief under 42 U.S.C. § 1983 and 28 U.S.C. §§ 2201–02 are the Republican Party of the City of Chicago and its chairman, Louis J. Kasper, who also is a registered voter in the City of Chicago; the Republican Party of Cook County and its chairman, Donald L. Totten; and Denise Barnes, a candidate for alderman in the City of Chicago and a registered voter.

On January 16, 1987, plaintiffs filed a complaint alleging that defendants Board of Election Commissioners of the City of Chicago and its members (collectively, "Board") have failed to develop a procedure to ensure an accurate canvass of registered voters prior to Chicago's February 24, 1987 primary election and April 7, 1987 general election, and have failed to develop a procedure to prevent improper reinstatement of persons stricken from the list of registered voters during canvassing.

These inadequacies, plaintiffs contend, will create a large pool of registered but ineligible or nonexistent voters whose ballots can be cast by dishonest election judges or precinct captains, and also will allow many ineligible voters to reinstate their registrations on election day. Plaintiffs assert that this jeopardizes their rights "to an honest election" and not to have "their honest votes diluted by ... vote fraud."

Plaintiffs seek three forms of relief. They ask the court to: (1) issue declaratory judgments "setting forth the constitutional and statutory duties of defendants to conduct a thorough pre-election canvass and develop an effective reinstatement procedure"; (2) issue injunctions requiring defendants to develop "a more effective and comprehensive means of performing the door-to-door canvass," and "an effective and comprehensive reinstatement procedure;" and (3) "[e]xercise its broad supervisory powers and hereinafter monitor and supervise the conduct of the defendants in performing their statutory duties between now and April 7, 1987 in order to ensure that the plaintiffs have the right to an honest election in the primary election on February 24, 1987 and the general election on April 7, 1987, free from vote fraud and corruption."

Two matters are now before the court: a motion by various individuals and organizations for leave to intervene as plaintiffs, and a consent judgment negotiated by plaintiffs and defendants and presented for the court's approval. At a hearing on January 22 the court heard oral arguments on these matters and on the existence of subject matter jurisdiction. The court took the case under advisement after receiving additional written arguments the following day. In ruling, the court turns first to the threshold question of jurisdiction.

### I. *Jurisdiction*

■ Article III of the United States Constitution limits the jurisdiction of federal courts to "Cases" or "Controversies" belonging to several limited and specific categories. Because the complaint alleges imminent violations of the Constitution and laws of the United States, its allegations fall squarely into one of these categories; the remaining question is whether the com-

plaint presents a case or controversy within the meaning of Article III. Intervening plaintiffs argue that the court lacks jurisdiction because granting the relief sought would improperly enmesh the federal courts in the electoral processes of the City of Chicago, and because plaintiffs' allegations are insufficient to state a claim for the violation of any constitutional or statutory provision.

The test for the existence of a case or controversy is less strenuous than the intervening plaintiffs assert. A case or controversy exists unless plaintiffs' claims are "so insubstantial, implausible, foreclosed by prior decisions of [the Supreme] Court, or otherwise completely devoid of merit as not to involve a federal controversy." *Hagans v. Lavine*, 415 U.S. 528, 542–43, 94 S.Ct. 1372, 1381–82, 39 L.Ed.2d 577 (1974) (quoting *Oneida Indian Nation v. County of Oneida*, 414 U.S. 661, 666–67, 94 S.Ct. 772, 776–77, 39 L.Ed.2d 73 (1974)). The claims in this case are not frivolous. While the arguments of the intervening plaintiffs have merit, they belong in a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), not in an objection to jurisdiction. The court finds that the complaint presents a case or controversy within its subject matter jurisdiction.[1]

## II. *Intervention*

The aspirant intervening plaintiffs consist of registered voters in the City of Chicago who were improperly purged from the list of eligible voters in the November 4, 1986 election, as well as an elected official registered to vote in the City of Chicago, and 11 organizations that participate actively in the electoral process and have many members who are registered voters.

They allege that, in past elections, careless and dishonest canvassing has resulted in the unjustified removal of many qualified voters from the official registration lists, and that these persons often have been prevented from voting because of inadequate reinstatement procedures. Intervening plaintiffs assert that the Board will not correct these deficiencies without action by this court, and accordingly seek two forms of relief: a declaratory judgment that the Board's practices violate their constitutional rights; and an injunction prohibiting the Board from removing qualified voters from the list of registered voters without allowing them to reinstate their registrations on election day by presenting two pieces of identification at their polling places.

Rule 24 of the Federal Rules of Civil Procedure provides that anyone may intervene in a civil action "[u]pon timely application ... when the applicant claims an interest relating to the property or transaction which is the subject of the action and he is so situated that the disposition of the action may as a practical matter impair or impede his ability to protect that interest, unless the applicant's interest is adequately represented by existing parties."

■ There can be no dispute about the timeliness of the intervenors' motion, which was filed only three court days after the main complaint. Nor can there be any serious dispute about intervenors' right to participate in this case. Disposition of plaintiffs' request for a more zealous canvass and stricter reinstatement procedures obviously will affect intervenors' interest in ensuring that eligible voters are not denied the right to vote. Because plaintiffs' principal interest is in ensuring that *no ineligible* voters are allowed to vote, while intervenors' principal interest is in ensuring that *all eligible* voters are allowed to vote, intervenors cannot expect plaintiffs to adequately represent their concerns. Moreover, in litigation involving an issue so sensitive and central to the democratic process as the eligibility of voters, the active participation of all interested parties is essential.

---

1. The court and the parties have considered whether abstention from the exercise of jurisdiction is appropriate under the doctrine of *Burford v. Sun Oil Co.*, 319 U.S. 315, 63 S.Ct. 1098, 87 L.Ed. 1424 (1943). No party presently urges abstention, and the rationale of *Burford* is inapplicable to this case.

### III. *Consent Decree*

■ While a consent judgment has many characteristics of a private contract between litigants, it is nonetheless a judgment bearing the imprimatur (or more appropriately, the *nihil obstat*) of the court and backed by its full authority. Before approving a proposed consent judgment, a court therefore has an affirmative duty to scrutinize its terms and determine that entry of the judgment would be consistent with the Constitution and laws of the United States, with the rights of third parties, and with the public interest. *United States v. City of Miami, Florida,* 664 F.2d 435, 439–42 (5th Cir.1981) (en banc). *See also Metropolitan Housing Development Corp. v. Village of Arlington Heights,* 616 F.2d 1006, 1013–15 (7th Cir.1980).

At the January 22 hearing, plaintiffs and the Board asked the court to approve a consent judgment under the terms of which the Board would admit plaintiffs' primary factual allegations and the court would order the Board to take the following actions:

1. Use its "best efforts to forthwith recruit and hire approximately 2,900 individuals who shall act as United States District Court Observers" during the canvass, accompanying the official canvassers for the purpose of monitoring and verifying the performance of the canvass. The Board must attempt to hire as observers persons without strong ties to any candidate and "who are associated with or employed by Chicago area colleges, high schools, other educational institutions, governmental entities and private businesses." The Board also must pay observers and canvassers $125 for their participation, and provide observers with at least one hour of training and written instructions.

2. Postpone the canvass from January 28 and 29, 1987, when state law requires it to be conducted, to the weekend of January 31 and February 1, 1987.

3. Require observers to file written reports on the accuracy of the canvass within seven days of its completion.

4. Advise canvassers and observers of their legal duty to conduct a thorough canvass, inform them of the availability of police protection, and provide them with a copy of the consent judgment.

5. Follow its current procedures for reinstatement of voter registrations purged during the canvass.

In addition, the consent judgment gives plaintiffs and their attorneys "the right to monitor and review" the Board's compliance with the judgment and provides that "[t]he Court shall retain jurisdiction over the parties, at least until April 7, 1987, to ensure that the terms of this Consent Judgment are complied with." Intervenors object to the entry of the consent judgment, arguing that it would increase the likelihood that they or their members will be improperly stricken from the list of eligible voters during the canvass.

This court is deeply sympathetic to the intentions of plaintiffs and the Board, and to the hopes they share with intervenors and the citizens of Chicago for an honest election, but entry of the consent judgment would be inconsistent with the court's responsibilities to the Constitution and to the public for the following reasons:

A. *There is no constitutional or statutory basis for this court's interference in the electoral processes of the City of Chicago.*

■ The Constitution strictly limits the power of federal courts to interfere with local elections. "The Constitution is not an election fraud statute, ... [and] '[i]t is not every election irregularity ... which will give rise to a constitutional claim and an action under section 1983'." *Bodine v. Elkhart County Election Board,* 788 F.2d 1270, 1272 (7th Cir.1986). Only "willful conduct which undermines the organic processes by which candidates are elected" implicates the Constitution and § 1983. *Hennings v. Grafton,* 523 F.2d 861, 864 (7th Cir.1975). As in *Hennings,* the allegations in this case suggest "at most irregularities caused by mechanical or human error and lacking in invidious or fraudulent

intent; [they do] not show conduct which is discriminatory by reason of its effect or inherent nature." *Id.*

This limitation on the authority of the federal judiciary is essential in order to ensure that the conduct of elections remains in the hands of the local officials chosen for this purpose by the public or their representatives. For this reason, higher courts have cautioned against unwarranted judicial intervention in local elections. "The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute," and state election laws would become largely superfluous. *Bodine, supra* at 1272 quoting *Gamza v. Aguirre,* 619 F.2d 449, 453 (5th Cir.1980).

The court recognizes that underlying plaintiffs' allegations against the Board is the nefarious conduct of some precinct captains. But those precinct captains are not defendants in this suit (though with luck they soon will find themselves defendants in criminal prosecutions), and none of the allegations against the Board of Elections suggest that *its* conduct has violated plaintiffs' rights.

Plaintiffs argue strenuously that the Board wishes to end the canvassing procedures that lead to violations of their constitutional rights, but lacks the power to act without the intervention of this court. This argument ignores the fact that the limits on the Board's powers derive from a complex statutory scheme enacted by Illinois legislators, one that has been the subject of frequent attacks, debate, and modification. Absent a clear constitutional violation, this court has no authority to override the carefully considered decisions of the Illinois legislature on a delicate political issue central to state sovereignty.

This case is essentially a dispute over how zealously the Board should attempt to purge ineligible persons from the voter registration lists. Plaintiffs advocate changing current procedures to reduce the likelihood that ineligible voters will reach the ballot box, while intervenors advocate changing current procedures to reduce the likelihood that eligible voters will be blocked from the ballot box. How to balance these competing interests is a political question for local authorities, not a constitutional issue for the federal courts.

Neither plaintiffs nor the Board have cited a single case in which a federal court has interfered with the authority of local officials to conduct an election in the absence of discrimination or intentional misconduct by local election officials, or has sanctioned the far-reaching intervention proposed here.

B. *The terms of the consent decree are impractical.*

█ Plaintiffs filed this case only 15 days before the scheduled completion of the canvass. In that time (extended to 17 days by the two-day delay which the consent decree proposes), plantiffs and the Board intend to prepare and execute with the court's assistance a canvass so thorough and accurate that it will ensure what may be the first truly honest election in the City of Chicago.[2]

---

**2.** Allegations of vote fraud and politically-oriented canvassing procedures are nothing new to Illinois. In 1840 in anticipation of the fall election, Abraham Lincoln wrote a secret letter to Illinois Whigs in which he said in part:

"The whole state must be so well organized that every Whig can be brought to the polls. This cannot be done without your help.

So divide your county into small districts and appoint in each a subcommittee; make a perfect list of all the voters, and ascertain with certainty for whom they will vote. Designate doubtful voters in separate lines, indicating their probable choice. Each subcommittee must keep a constant watch on the doubtful voters and have them talked to by those in whom they have the most confidence—also Whig documents must be given them.

These subcommittees must report to the county committee at least once a month and on election days see that every Whig is brought to the polls...."

Eighteen years later, Lincoln wrote a letter complaining to a fellow Republican about Democrats' attempts to undermine the integrity of an impending election:

As laudable as this goal is, the consent decree poses enormous practical problems. How, in such a short time, can the Board recruit and train 2,900 nonpartisan observers? Will some of the observers be high school students, as the order's language suggests? Who will choose the observers and on what basis? Who will have the right to challenge their selection and monitor their performance? Where will the substantial amount of money come from to hire observers and increase the salaries of the official canvassers? And can 2,900 observers really ensure the accuracy of a canvass when they are sent, barely trained and unfamiliar with the art and craft of precinct politics, into neighborhoods with which they are unfamiliar and about which they are uninformed, in a city where some neighborhoods are unsafe, and when they must knock on the doors of tenements, lofts, inaccessible apartments, and unmarked buildings and residences, interviewing people whose lives they cannot comprehend, whose identities they do not know, and whose veracity they cannot judge?

At least to some extent, the prevalence of vote fraud in Chicago owes its persistence to a single party's domination of the political system. As that party's cohesiveness declines, perhaps it is inevitable that warring factions will be more tempted than ever to make use of the opportunities for fraud, and will suspect their opponents of succumbing to this temptation. The very divisiveness that produces accusations of fraud, however, may only be a sign of an increasingly competitive political environment that presents the greatest hope for more honest elections.

## CONCLUSION

The problems that plaintiffs address are genuine, but far beyond the power of any judge to solve—let alone in the next two weeks, a time so short that it forecloses any deliberative inquiry into the causes and remedies of election fraud. Refusal to accept this reality may simply deepen the problems and postpone the time when citizens, politicians, and election officials work together, as they must, to bring about lasting improvements in the electoral process. Until that day, all of us must live with the fractiousness, tumult, frustrations, and triumphs of a democratic process which, however hurly-burly, is our own.

The court grants the motion for leave to intervene and rejects the proposed consent decree.

IT IS SO ORDERED.

I now have a high degree of confidence that we shall succeed, if we are not over-run with fraudulent votes to a greater extent than usual. . . .
What I most dread is that they will introduce into the doubtful districts numbers of men who are legal voters in all respects except *residence* and who will swear to residence and thus put it beyond our power to exclude them. They can & I fear will swear falsely on that point, because they know it is next to impossible to convict them of Perjury upon it.