814 F.2d 332
 Louis KASPER, Chairman, City of Chicago Republican Party;
Donald L. Totten, Chairman, Cook County Republican Party;
Denise Barnes, Aldermanic Candidate for the 42d Ward; City
of Chicago Republican Party; and Cook County Republican
Party, Plaintiffs-Appellants,
Congressman Charles A. Hayes, et al., Intervening Plaintiffs-Appellees,
v.
BOARD OF ELECTION COMMISSIONERS OF THE CITY OF CHICAGO, et
al., Defendants- Appellants.
 Nos. 87-1125 and 87-1126.
 United States Court of Appeals,
Seventh Circuit.
 Argued Jan. 27, 1987.
Decided Jan. 27, 1987.*
Opinion March 11, 1987.
Opinion on Rehearing April 27, 1987.
 
 Dan K. Webb, Winston & Strawn, Chicago, Ill., plaintiffs-appellants.
 Franklin J. Lunding, Jr., Biggam Cowan, Marquardt & Lunding, Chicago, Ill., for defendants-appellees.
 Terence E. Flynn, Gessler, Wexler, Flynn, Laswell & Fleischmann, Chicago, Ill., for intervening plaintiffs-appellees.
 Before COFFEY and EASTERBROOK, Circuit Judges, and PELL, Senior Circuit Judge.
 EASTERBROOK, Circuit Judge.
 
 
 1
 Once Chicago was known as Hog Butcher to the World. No more. One Chicago industry is hardier: election fraud. The dead awaken just in time to vote on election day. By one estimate in this litigation, 9% of the "voters" registered in Chicago are tombstones, vacant lots, and people who have moved out of the city. These ghost voters answer the call of precinct captains, who vote their proxies on election day or find some reliable party member to do so. Cooperative election judges refrain from challenging multiple votes by the same person under different names. This dilutes the votes of the honest and alters the outcome of elections. We must decide whether the district court erred in refusing to approve a proposed consent decree that would have reduced the number of ghost voters.
 
 
 2
 * Any system of registration must deal with deaths, movement, and bogus claims of all sorts. The principal device for doing this in Illinois is the canvass of registered voters. People may register to vote until 29 days before the election. The Board of Election Commissioners for the jurisdiction makes up a list of all registered voters in each precinct, including the address of each. Ill.Rev.Stat. ch. 46 Sec. 6-38. "Upon the Wednesday and Thursday following the last day of registration ... 2 deputy registrars shall go together and canvass the precinct for which they have been appointed, calling at each dwelling place or each house from which any one is registered ... and if they shall find that any person whose name appears upon their verification lists does not reside at the place designated thereupon, they shall make a notation in the column headed 'Remarks' as follows: 'Changed Name'; 'Died', or 'Moved', as the case may be, indicating that such person does not reside at such place." Sec. 6-39. Deputy registrars may require the local police to accompany them. Ibid. If the deputy registrars question the validity of a registration, the Board must mail the questioned person a postcard no later than 10:00 p.m. on Friday of the week of the canvass. Sec. 6-40. The postcard invites the person to show cause why his name should not be struck from the rolls. The questioned person may respond to the card with an affidavit of eligibility to vote, and the Board must resolve any disputes after an evidentiary hearing. Sec. 6-41. After resolving these contests, and at least 19 days before the election, the Board prepares and distributes the final list of eligible voters. Sec. 6-43.
 
 
 3
 Each board and its deputy registrars are adjuncts of the circuit court of the county. The court designates the three commissioners of each board, Sec. 6-21, and each "leading political part[y]" in the jurisdiction must be represented, Sec. 6-22. The court may remove any commissioner for "cause shown". Sec. 6-23. The Board then appoints both judges of election (to adjudicate challenges at the polls) and deputy registrars (to conduct the canvass); the same standards apply to each.** Both are "officers of the court". Sec. 6-32. The deputy registrars must be reputable voters, Sec. 14-1, and one represents each principal political party in the precinct, Sec. 14-4. The Board selects the deputy registrars "from certified lists furnished by the chairman of the respective county central committees of the 2 leading political parties." Ibid.
 
 
 4
 This is a political version of the adversary system. The Board represents political parties; the parties select the deputy registrars, who watch each other. The deputy registrars also must respond to complaints. Any registered voter may demand that a deputy registrar investigate a suspicious registration. Sec. 6-38. Anyone dissatisfied with the work of the deputy registrars may complain, and "[i]t shall be the duty of the Board of Election Commissioners, when complaint is made to them, to investigate the action of such canvassers and to cause them or either of them to be brought before the circuit court and to prosecute them as for contempt, and also at the discretion of the Board of Election Commissioners, to cause them to be prosecuted criminally for such wilful neglect of duty." Sec. 6-40. A Commissioner who fails in this duty may be removed by the circuit court under Sec. 6-23 on the complaint of 25 voters.
 
 
 5
 Registrars, deputy registrars, and judges of election are paid by the Board. The fee for these services in Chicago is fixed by Sec. 6-71 at "not less than $20 nor more than $30 per day." The canvass lasts two days, so the pay apparently must fall between $40 and $60 per canvasser. Under Sec. 6-70 Cook County and Chicago share the expenses of the Board, and it is "the duty of the governing authority of such counties and cities, respectively, to make provisions for the prompt payment of such salaries and expenditures." Funds are disbursed "upon the warrant of [the] chief circuit judge" after the court has audited the Board's expenditures. Ibid.
 
 II
 
 6
 Primary elections for municipal offices in Chicago are held the last Tuesday of the February preceding the general election in April. Secs. 2A-1.1, 7-5. Municipal offices are contested the year before the Presidency, making February 24, 1987, the occasion of a municipal primary. Registration for the primary ended 29 days earlier, on January 26, 1987. Section 6-38 therefore designated January 28 and 29, 1987, as the days for the canvass.
 
 
 7
 On Friday, January 16, 1987, the Republican Party of Chicago (and its chairman), the Republican Party of Cook County (and its chairman), and one candidate in the primary filed this suit invoking 42 U.S.C. Sec. 1983. They contended that for years the Board of Election Commissioners of Chicago has flouted its duties under state law in conducting the canvass, as a result of which the rolls are packed with ghost voters. The complaint alleged that the Board has "failed to adequately conduct a door to door canvass that deletes improperly registered voters". The complaint characterized the inadequate canvass as "the first step to successful vote fraud" that depends on a "pool of absent voters to be used by a dishonest precinct captain to cast fraudulent votes on election day". These extra votes, according to the complaint, dilute the value of honestly cast votes. The plaintiffs maintained that in 1984 the Illinois Committee for Honest Elections (apparently an organization under the control of the Republican Party of Illinois) had mailed 890,000 letters to registered voters, asking the Postal Service to return rather than forward undeliverable mail; 9.1% of these letters (81,207) came back as undeliverable. According to the complaint, "[i]t is from this pool of voters that the dishonest precinct captain is able to successfully engage in fraud on election day. The plaintiffs contend that a 10% [sic] vote fraud factor can literally affect the outcome of almost any election." The Committee in 1986 detected 36,000 people registered twice--although only 264 of these actually voted twice in the 1986 primary. The complaint stated that a "preliminary" check had revealed that "numerous" illegal registrations had survived the most recent canvass in October 1986 and that there were then 44,000 duplicate registrations (out of about 1.4 million).
 
 
 8
 The complaint made only one concrete allegation about what was going wrong in the canvassing process. It alleged that the canvassers "do not actually go door to door" to verify the registrations. Some shirk because they are paid too little, others because they want to keep the ghost voters on the rolls; some "fear for their safety" and avoid particular neighborhoods. The result of the dereliction, according to the complaint, will be "massive vote fraud" in February and April 1987. The plaintiffs asked for a declaratory judgment "setting forth the statutory and constitutional duties of the defendants" and an injunction "requiring the defendants to develop a more effective and comprehensive means of performing the door to door canvass ... so that registered voters who do not meet the statutory registration requirements are purged from the list". The plaintiffs also asked the court to "[e]xercise its broad supervisory powers and hereafter monitor and supervise the conduct of the defendants in performing their statutory duties".
 
 
 9
 On January 21 a new group of plaintiffs intervened. This group (the Hayes plaintiffs) included Rep. Charles A. Hayes, several organizations of "independent" voters, two unions, the National Organization for Women, Operation PUSH, Por Un Barrio Mejor, and the Task Force for Black Political Empowerment. The Hayes plaintiffs agreed with the Republican plaintiffs that the Board had done a lousy job, but the Hayes plaintiffs thought that the canvassers' worst failing lay in striking too many people from the rolls. According to the intervenors, the canvassers challenged properly registered voters, who had to travel long distances to be reinstated before the election--if they managed to be reinstated at all.
 
 
 10
 The Republican plaintiffs and the Board engaged in private negotiations. A few hours after the Hayes plaintiffs intervened, the Republican plaintiffs and the defendants (the Board and its three Commissioners) filed a proposed consent decree. The document contained these admissions:
 
 
 11
 4. ... [T]he defendants admit there is difficulty ensuring that only qualified persons are included ... on the roll of registered voters, principally because the canvassers have failed to adequately conduct a door-to-door canvass that deletes improperly registered voters as required by [statute];
 
 
 12
 5. ... [T]he potential for vote fraud during the upcoming elections could be eliminated or significantly reduced by a more effective and comprehensive door-to-door canvass ...;
 
 
 13
 6. ... [I]n the most recent canvass in October, 1986, some official canvassers failed to delete numerous voter registrations which did not meet the eligibility requirements ...;
 
 
 14
 7. ... [T]he defects in the October, 1986, canvass, if allowed to continue, create the potential for vote fraud in the upcoming 1987 elections which could deprive the plaintiffs of their right to an honest election, free of vote fraud that will dilute their honest votes[.]
 
 
 15
 In order to improve the accuracy of the canvass, the Republican plaintiffs and the Board agreed to take these steps:
 
 
 16
 9. The defendants shall ... forthwith recruit and hire approximately 2,900 individuals who shall act as United States District Court Observers ...;
 
 
 17
 10. The defendants shall ... assign one Observer to each of the 2,900 Chicago election precincts for the purpose of accompanying the official canvassers, and observing, monitoring and verifying the performance of the canvassers as they conduct the door-to-door canvass.... The Observers shall make a full report of their observations to this Court ...; [Paragraph 18 requires the report to be made within seven days, with copies to the plaintiffs.]
 
 
 18
 [Paragraphs 11 and 12 provide that the Observers shall be unaffiliated with any candidate running for office and, to the extent possible, shall be affiliated with educational institutions, the government, and private businesses. Paragraphs 13 and 14 deal with credentials and training.]
 
 
 19
 15. The defendants shall compensate the Observers in the amount of $125 for their attendance at the training session and their participation in the canvass. In addition, the defendants are required to increase the compensation of each official canvasser to $125 for canvassing their assigned precinct so that their compensation is commensurate with that of the Observers; [Intervening sections omitted.]
 
 
 20
 20. The defendants agree to develop and implement the following procedures ...;
 
 
 21
 a. The defendants shall cause the canvass ... to be conducted and performed on Saturday, January 31 and Sunday, February 1, 1987 in place of the canvass scheduled to occur on January 28 and 29, 1987. Moving the canvass dates to a weekend should result in a more thorough and complete canvass; [subsections omitted]
 
 
 22
 e. The defendants shall advise the canvassers of the availability of police protection to which they are entitled under the [law], and will take all reasonable action to ensure that such police protection is provided the canvassers as requested;
 
 
 23
 f. ... To the extent that any Observer canvass report, or other reliable information, reflects that a particular precinct was not subject to a reasonably accurate and complete door-to-door canvass, the defendants must perform an additional confirming canvass of that precinct. This confirming canvass must be conducted by employees of the defendants, and a confirming canvass report must be prepared by the defendants and filed with the Court, with a copy delivered to the plaintiffs;
 
 
 24
 g. The defendants shall follow their current procedures for reinstatement of any voter registration that is purged as a result of the canvass or confirming canvass referenced above [but shall expand from 25 to 50 the number of places where a voter may be reinstated as late as election day];
 
 
 25
 21. The plaintiffs and their attorneys shall have the right to monitor and review the defendants' performance of their duties and responsibilities under this Consent Judgment. This shall include, but is not limited to, the review and monitoring of the selection of the Observers, the training of the Observers, the preparation of instructions for the Observers and the review and analysis of the Observer canvass report forms.... [T]he defendants shall allow the plaintiffs such access to their offices and facilities as is necessary to monitor and verify compliance by defendants with the provisions of this Consent Judgment;
 
 
 26
 22. The Court shall retain jurisdiction over the parties, at least until April 7, 1987, to ensure that the terms of this Consent Judgment are complied with.
 
 
 27
 This proposed decree made some important changes in the way the canvass was to be conducted: (1) It created the "United States District Court Observer"; (2) It increased the pay for canvassers above the maximum specified by Sec. 6-71 and paid Observers, who are not mentioned in the state statute, producing an increased outlay of about $880,000 (according to the Hayes plaintiffs) for the February 1987 canvass alone; (3) It changed the canvass from the midweek days specified by Sec. 6-39 to a weekend, and the parties later agreed to postpone the canvass still further to the weekend of February 7 and 8; (4) It provided for a re-canvass, which the statute does not, to be conducted by the Board's employees, despite the statutory requirement that deputy registrars do the canvassing; (5) It provided for better notice of the canvassers' right to be accompanied by police; (6) It required better training of the canvassers; (7) It gave the Republican Party a special role as overseer of the Board, despite the statutory scheme establishing an equal role for each major party; (8) It substituted the United States District Court for the Circuit Court of Cook County as the forum to resolve disputes about the Board's performance.
 
 
 28
 The Hayes plaintiffs vehemently opposed entry of this decree, protesting the favored role it would give to the Republican Party and complaining that the new canvass would produce a "super purge" of eligible voters. The Hayes plaintiffs also contended that the Republican plaintiffs' complaint did not establish either federal jurisdiction or any violation of federal rights. The district court held a hearing on January 22 and released an opinion the next day declining to enter the proposed decree. 651 F.Supp. 1311.
 
 
 29
 The court concluded that the complaint establishes federal jurisdiction under the risibility standard of Hagans v. Lavine, 415 U.S. 528, 542-43, 94 S.Ct. 1372, 1381-82, 39 L.Ed.2d 577 (1974)--that is, unless it is impossible to read the complaint with a straight face or the contention was recently and authoritatively rejected, there is federal jurisdiction even if the claim must fail on the merits. If a court accepts a decree, it need not decide the merits; the parties are free to agree on relief more extensive than federal law requires, for a consent decree is essentially a contract. Firefighters Local 93 v. City of Cleveland, --- U.S. ----, 106 S.Ct. 3063, 92 L.Ed.2d 405 (1986). Yet a decree is not exactly a contract; it is an exercise of federal power, enforceable by contempt. The source of the obligations in the decree is the parties' will, not federal law. That is the contractual aspect of the decree. Finding the authority to impose obligations is not the only objective of a federal court, though. A judge has obligations to other litigants, who may depend on the availability of his time, and to members of the public whose interests may not be represented by the litigants. A district judge need not lend the aid of the federal court to whatever strikes two parties' fancy. A "federal court is more than 'a recorder of contracts' from whom private parties may purchase injunctions". Id., 106 S.Ct. at 3077. Before entering a consent decree the judge must satisfy himself that the decree is consistent with the Constitution and laws, does not undermine the rightful interests of third parties, and is an appropriate commitment of the court's limited resources. See United States v. City of Miami, 664 F.2d 435, 439-42 (5th Cir.1981) (en banc); cf. Secretary of Labor v. Fitzsimmons, 805 F.2d 682, 695-97 (7th Cir.1986) (en banc); Alliance to End Repression v. City of Chicago, 742 F.2d 1007 (7th Cir.1984) (en banc). Considerations of this character led the district judge to withhold his assent.
 
 
 30
 The court first concluded that the decree is not necessary to rectify a violation of federal rights yet would propel the federal court into the regulation of local elections. "The Constitution strictly limits the power of federal courts to interfere with local elections", the court stated, and the allegations and admissions in this case do not make out a violation because they do not demonstrate the sort of wilful interference by the Board with voting that alone violates federal law. The "far-reaching intervention proposed here", the court concluded, has no support in any case. The district judge also thought it impractical to implement the consent decree on such short notice. The suit had been filed less than two weeks before the start of the canvass, and it struck the judge as unlikely that 2,900 observers could be found and trained on such short notice. The court also asked, among other things: "Where will the substantial amount of money come from to hire observers and increase the salaries of the official canvassers? And can 2,900 observers really ensure the accuracy of a canvass when they are sent, barely trained and unfamiliar with the art and craft of precinct politics, into neighborhoods with which they are unfamiliar and about which they are uninformed, in a city where some neighborhoods are unsafe, and when they must knock on the doors of tenements, lofts, inaccessible apartments, and unmarked buildings and residences, interviewing people whose lives they cannot comprehend, whose identities they do not know, and whose veracity they cannot judge?"
 
 
 31
 Both the Republican plaintiffs and the Board appealed, on the authority of Carson v. American Brands, Inc., 450 U.S. 79, 101 S.Ct. 993, 67 L.Ed.2d 59 (1981). We heard oral argument on the morning of January 27 and affirmed the same day, permitting the canvass to proceed as required by statute on January 28 and 29. As the brief order entered that day states, we are concerned only with whether the district judge abused his discretion. Donovan v. Robbins, 752 F.2d 1170, 1177 (7th Cir.1985). "Abuse of discretion" means a serious error of judgment, such as reliance on a forbidden factor or failure to consider an essential factor. Metlyn Realty Corp. v. Esmark, Inc., 763 F.2d 826, 830-32 (7th Cir.1985); Tolliver v. Northrop Corp., 786 F.2d 316, 318-19 (7th Cir.1986). Only if the reviewing court is confident that the decision is quirky may it substitute its own judgment. The appellate court's role is to ensure that the idiosyncrasies of the district judge and momentary lapses of judgment do not undercut the administration of justice. Cf. Anderson v. City of Bessemer City, 470 U.S. 564, 573-75, 105 S.Ct. 1504, 1511-13, 84 L.Ed.2d 518 (1985). Although the prospect of cleaning up Chicago's politics is alluring, the district court's decision was reasoned rather than whimsical. There were strong reasons to enter this decree, for the elimination of voting fraud is an interest of great moment; there were also strong reasons to think the proposed decree improvident. The resolution of such matters belongs to the district courts.
 
 III
 
 32
 The district court gave two principal reasons: that the complaint fails to state a claim on which relief may be granted and that entry of the particular decree proposed would be imprudent. We look at questions of prudence first, because we believe that it was not an abuse of discretion to withhold approval of this decree, at this time. See Donovan v. Robbins, 752 F.2d at 1176, 1182. Quite a few considerations support the court's decision that, serious as election fraud is, it was better to wait than to act in haste.
 
 
 33
 1. This suit was filed on the eve of the canvass. That deprived the court of time to evaluate either the case or the decree with care. Yet the plaintiffs offer no reason for their delay. Fraud in Chicago's elections is regrettably endemic. The complaint's most damning evidence is from a survey conducted in 1984. Judges are entitled to time to think; parties may not stampede a judge into a rash decision by waiting until the last minute to press a claim that has been available for decades.
 
 
 34
 2. The allegations of the complaint, and the concessions of the Board, concern canvasses past. Recognizing the failings of earlier canvasses, the Board established its own system of "watchers" for the January 1987 canvass. After public hearings, the Board decided to permit each political party and faction to designate a watcher for each precinct to accompany the canvassers on the rounds. These watchers may demand investigations under Sec. 6-38, engaging for both the canvasser and the Board a duty to determine the challenged person's eligibility to vote. See also Secs. 6-40, 6-44. The consent decree would have altered the system of watchers before it had a chance to work (or fail). The district court's decision to withhold approval made it possible to gather evidence about the effects of devices less drastic than those proposed in the consent decree.
 
 
 35
 3. A court must consider the interests of third parties. Duran v. Elrod, 760 F.2d 756, 759 (7th Cir.1985). This proposed decree threatened the interests of the Hayes plaintiffs, who believe that the new system would remove properly registered voters from the rolls. This may be an inevitable effect of a rigorous canvass, but the consequences would have been aggravated here by the delay in holding the canvass. Under the amended proposed decree, the canvass would have occurred on February 7 and 8; notices to show cause would have been mailed on February 9, only 15 days before the primary. This would have made it almost impossible for people challenged by the canvassers to remain on the list for the election. They might have been restored to the list by last-minute affidavit, but that is a considerable burden and entails travel to special offices in addition to the regular polling places. The burden would fall especially hard on handicapped and low-income voters and those required to use public transportation.
 
 
 36
 4. By establishing "United States District Court Observers", the parties borrowed the name and prestige of the institution. The district judge was entitled to be skeptical of the efficacy of observers trained (the decree provided) for one hour apiece and sent into strange neighborhoods. If these Observers failed to improve the accuracy of the canvass, the failure could have reflected poorly on the institution whose name they carried. The Republican plaintiffs and the Board say that the court should not have doubted the ability of the Board, an "expert" body, to find and train 2,900 Observers in a week. Yet the complaint says that the Board is more oafish than expert, and the Board has conceded its own ineptitude. The Board's errors in selecting and supervising Observers would be on the court's head--for they would be "its" eyes and ears, and complaints would come to it.
 
 
 37
 5. The decree would substitute the district court for the circuit court as the principal overseer of the canvass. The Republican plaintiffs would be entitled to the court's decision on complaints of all sorts, from the selection of the Observers to the use the Board made of their reports. At oral argument, the Republican plaintiffs even conceded that the district court might have to adjudicate challenges to individual voters. This could propel the court into the minutiae of the Board's functions, a whopping reallocation of authority from state to federal government, from political to judicial actors.
 
 
 38
 A federal court must preserve the appropriate relation between state and national power. Such "concerns caution against excessive entanglement of federal courts in state election matters. 'The very nature of the federal union contemplates separate functions for the states. If every state election irregularity were considered a federal constitutional deprivation, federal courts would adjudicate every state election dispute, and the elaborate state election contest procedures, designed to assure speedy and orderly disposition of the multitudinous questions that may arise in the electoral process, would be superseded ...' ". Bodine v. Elkhart County Election Board, 788 F.2d 1270, 1272 (7th Cir.1986), quoting from Gamza v. Aguirre, 619 F.2d 449, 453 (5th Cir.1980). See also Grimes v. Smith, 776 F.2d 1359, 1367 (7th Cir.1985) (monitoring the conduct of elections "is a role that the federal judiciary should not be quick to assume").
 
 
 39
 The Board's willingness to transfer its responsibilities to the federal court does not oblige the court to accept. See Lelsz v. Kavanagh, 807 F.2d 1243 (5th Cir.1987); Handschu v. Special Services Division, 787 F.2d 828, 833 (2d Cir.1986) (a district court should consider "limitations on [a court's] equity power and important principles of federalism" in deciding whether to enter a consent decree). The Board also does not have the last word on this subject as a matter of Illinois law, and district judges should be on the lookout for attempts to use consent decrees to make end runs around the legislature; the state as a whole, and not the Board, fixes the structure of the electoral machinery unless the state's preferred structure violates the Constitution. See also Georgevich v. Strauss, 772 F.2d 1078, 1085 (3d Cir.1985) (en banc) (the district court's "legitimate concerns about federal-state relations" are a good reason not to approve a consent decree).
 
 
 40
 6. A federal judge must be concerned about other cases. Each district judge in Chicago must resolve about 450 cases per year. Every hour consumed administering a consent decree is an hour taken from other litigants, who must wait in a longer queue. If the Republican plaintiffs have identified a violation of the Constitution, then the hours devoted to devising and administering a remedy are well spent. But if only compliance with state law is at issue, then the time detracts from the enforcement of federal rights in other cases. The Republican plaintiffs and the Board are not entitled to divert scarce judicial time from other litigants to themselves on the showing they have made so far.
 
 
 41
 7. The Republican plaintiffs' complaint contends that the Board has neglected its duties under state law. Yet the decree does not stop with perfecting the Board's adherence to state law and exercising such discretion as the Board possesses. It commits the Board to violate state law. Section 6-71 sets a maximum payment of $60 to deputy registrars for a two-day canvass and does not authorize pay for training sessions; the decree requires the Board to pay $125 both to deputy registrars and to observers who are not mentioned in the statute. Section 6-39 sets the dates of the canvass; the decree requires the Board to use later dates, and to switch from mid-week to weekend dates. The statute names deputy registrars selected by the political parties as the official canvassers; the decree provides for re-canvasses by the Board's staff rather than by deputy registrars. The statute gives both major parties equal roles in the canvass; the decree gives the Republican Party a dominant role.
 
 
 42
 The provisions of the decree reflect not a belief that the Board has been unfaithful to state law but an objection to the provisions of state law. The Republican plaintiffs and the Board say that $35, which the Board apparently has been paying, is too low to attract competent canvassers. They presumably object to $60, the statutory cap, as well. They say that weekends are preferable to Wednesdays and Thursdays for canvassing--both because more people are at home for the check and because the people most qualified to do the checking hold jobs during the week, making them unavailable as canvassers. And the Republican plaintiffs say that the system under which each political party picks a canvasser, and the canvassers watch each other, is undesirable because "partisanship" is inappropriate in the registration process. (So the Party's lawyer said at oral argument.) The Republican plaintiffs may feel this way because they have had trouble finding 2,900 dedicated partisans to do hard work for a pittance in Chicago and believe that many of the people on the street as Republican canvassers are in fact the henchmen of their rivals. Still, it is inescapable that the terms of the proposed decree do not put the Board into compliance, at long last, with Illinois law. They excuse the Board from such portions of Illinois law as the Republican plaintiffs and the Board find objectionable.
 
 
 43
 When "it is the parties' agreement that serves as the source of the court's authority to enter any judgment at all", Firefighters, 106 S.Ct. at 3076, the court may not readily approve a decree that contemplates a violation of law. The Board may not "consent" to a higher budget or a new organic statute. Its Commissioners could not "consent" to be free of the threat of removal by the circuit court; it is equally outside the power of the Board to agree to violate state law in other ways. "Because a consent decree's force comes from agreement rather than positive law, the decree depends on the parties' authority to give assent.... Some rules of law are designed to limit the authority of public officeholders, to make them return to other branches of government or to the voters for permission to engage in certain acts. They may chafe at these restraints and seek to evade them". Dunn v. Carey, 808 F.2d 555, 560 (7th Cir.1986). A consent decree is not a method by which state agencies may liberate themselves from the statutes enacted by the legislature that created them. The Commissioners are agents, not principals; they need their principals' approval to alter the terms of the agency. An alteration of the statutory scheme may not be based on consent alone; it depends on an exercise of federal power, which in turn depends on a violation of federal law. See National Revenue Corp. v. Violet, 807 F.2d 285, 288 (1st Cir.1986) (a consent judgment in which the executive branch of a state consents not to enforce a law is "void on its face"). The district court therefore properly insisted on a demonstration of at least a probable violation of that law as a condition to the entry of this decree. This takes us naturally to the court's other ground: its belief that the Republican plaintiffs' complaint does not allege a violation of federal law.
 
 IV
 
 44
 The United States District Court and the Circuit Court of Cook County have offices three blocks apart in Chicago. It is tempting to suppose that a messenger mistook the sign on the door and delivered the complaint in this case to the wrong court. The complaint calls on the court to inform the Board of its duties under state law and to "[e]xercise its broad supervisory powers and hereafter monitor and supervise the conduct of the defendants in exercising their statutory duties". The circuit court hires and fires the Commissioners, Secs. 6-21, 6-23; it supervises the conduct of the canvass and punishes offenses against the election laws, Sec. 6-40; it audits the Board's books, Sec. 6-70. The Board is an affiliate of the court, and the canvassers are "officers of the court", Sec. 6-32. Only that court has "broad supervisory powers" over the Board.
 
 
 45
 The district court has no supervisory powers and no authority to instruct the Board how to follow state law. A violation of state law does not state a claim under Sec. 1983; we have rejected such contentions repeatedly, e.g., Gramenos v. Jewel Companies, Inc., 797 F.2d 432, 434-35 (7th Cir.1986), and just the other day we held a claim of this character so feeble that it justified an award of attorneys' fees on the court's initiative. Weinstein v. University of Illinois, 811 F.2d 1091, 1097-98 (7th Cir.1987). That this case involves elections does not matter. Snowden v. Hughes, 321 U.S. 1, 11, 64 S.Ct. 397, 402, 88 L.Ed. 497 (1944), holds that a deliberate violation of state election laws by state election officials does not transgress against the Constitution. See also, e.g., Home Telephone & Telegraph Co. v. City of Los Angeles, 227 U.S. 278, 33 S.Ct. 312, 57 L.Ed. 516 (1913); Barney v. City of New York, 193 U.S. 430, 24 S.Ct. 502, 48 L.Ed. 737 (1904); Grano v. Barry, 733 F.2d 164, 169 (D.C.Cir.1984). More, whether or not the Board is "the state", so that the eleventh amendment forbids resort to state law as the basis of decision, see Citizens for John W. Moore Party v. Board of Election Commissioners, 781 F.2d 581, 584-86 (7th Cir.1986) (dissenting opinion; the majority did not resolve the Board's status), a federal court must exercise restraint in upbraiding an organ of state government for infidelity to state law. "[I]t is difficult to think of a greater intrusion on state sovereignty than when a federal court instructs state officials on how to conform their conduct to state law." Pennhurst State School and Hospital v. Halderman, 465 U.S. 89, 106, 104 S.Ct. 900, 911, 79 L.Ed.2d 67 (1984). See also Huggins v. Isenbarger, 798 F.2d 203, 208-09 (7th Cir.1986) (concurring opinion); Grano, 733 F.2d at 169 ("Vindication of state policy ought, as an initial matter, to take place in state courts").
 
 
 46
 The deficiencies in the complaint need not prevent entry of a decree. "[I]t is the agreement of the parties, rather than the force of the law on which the complaint was originally based, that creates the obligations embodied in a consent decree." Firefighters, 106 S.Ct. at 3076. Jurisdictional problems to one side--the Fifth Circuit has questioned whether the eleventh amendment permits the entry of consent decrees that impose obligations on states, see Lelsz, 807 F.2d at 1253-55--the parties may create any obligations that are not forbidden by law. The decree as contract may contain such terms as any other contract could. The Board could promise to obey state law and could make concrete its pledge to do better. The decree the parties proposed contains a number of provisions that could stand on the basis of consent alone. These include the creation of a system of nonpartisan observers, better training, effectual police protection, higher pay (according to the Hayes plaintiffs, the Board now pays only $35 per canvass, which appears to be too low under state law), vigorous prosecution of all canvassers who violate their duties. But it also contains provisions committing the Board to violate state law (see Part III.7 above). These latter provisions could be supported only by federal interests that override the rules of state law.
 
 
 47
 The complaint does not allege that the Board has stuffed ballot boxes or suffered any ghost voters of which it knows to remain on the rolls. It alleges only that the Board is aware that a substantial number of registrations are bogus and has not alleviated the situation. The Board admitted in the proposed decree that the "canvassers have failed to adequately conduct a door-to-door canvass" and that this failure creates "the potential for vote fraud"--a potential that could be "significantly reduced by a more effective and comprehensive door-to-door canvass". This admission of cause and effect does not directly establish an intent on the Board's part to dilute anyone's vote, see Personnel Administrator of Massachusetts v. Feeney, 442 U.S. 256, 278-80, 99 S.Ct. 2282, 2295-97, 60 L.Ed.2d 870 (1979) (knowledge of consequences is not intent, unless the acts were undertaken in order to produce these consequences); American Nurses' Ass'n v. Illinois, 783 F.2d 716, 722-23 (7th Cir.1986) (same). We have said that intent is an essential ingredient of a constitutional election fraud case under Sec. 1983. See Hennings v. Grafton, 523 F.2d 861, 864-85 (7th Cir.1975); Bodine, 788 F.2d at 1272. "[S]ection 1983 is implicated only when there is 'willful conduct which undermines the organic processes by which candidates are elected'." Bodine, 788 F.2d at 1272, quoting Hennings, 523 F.2d at 864 (emphasis added by Bodine ).
 
 
 48
 The complaint does not allege, and the proposed decree does not admit, that the Board desires the dilution of honest votes and is trying to ensure an adequate supply of ghost voters. The natural reading of the documents is that the Board has done a slapdash job of administering the law, and that private parties ("dishonest precinct captains") have taken advantage of its laxity. The failure of the police and other agents of the government to stop private offenders is not itself a violation of the Constitution. DeShaney v. Winnebago County Department of Social Services, 812 F.2d 298 (7th Cir.1987); Walker v. Rowe, 791 F.2d 507, 509-10 (7th Cir.1986); Ellsworth v. City of Racine, 774 F.2d 182, 185-86 (7th Cir.1985); Hinman v. Lincoln Towing Service, Inc., 771 F.2d 189, 194 (7th Cir.1985); Jackson v. Byrne, 738 F.2d 1443, 1446-47 (7th Cir.1984); Jackson v. City of Joliet, 715 F.2d 1200, 1203-04 (7th Cir.1983); Bowers v. DeVito, 686 F.2d 616 (7th Cir.1982). So if, as in Jackson v. City of Joliet, police direct traffic around a burning car without trying to save its occupants, their inaction does not violate constitutional rights of the occupants, although it may violate state law. The remedies for ineffectual public officials are political rather than constitutional.
 
 
 49
 Despite all of this, however, there may be a federal claim in the complaint. In a system of notice pleading, judges should read complaints generously. American Nurses' Ass'n, 783 F.2d at 723-24. The district court jumped the gun in holding that the Republican plaintiffs could not establish an entitlement to relief. According to the Republican plaintiffs' complaint, the Board has done more than stand passively while "dishonest precinct captains" rigged elections. It has maintained official registration lists that serve the "dishonest precinct captains' " purposes. The complaint depicts these precinct captains as working in cahoots with election judges who permit people to vote more than once. The election judges, as appointees of the Board and "officers of the court" under Sec. 6-32, are state actors. Their casting (or approval) of fictitious votes can violate the Constitution and other federal laws. See Anderson v. United States, 417 U.S. 211, 223-28, 94 S.Ct. 2253, 2261-64, 41 L.Ed.2d 20 (1974) (conviction under 18 U.S.C. Sec. 241 for fictitious votes); United States v. Saylor, 322 U.S. 385, 64 S.Ct. 1101, 88 L.Ed. 1341 (1944) (same). The acts of subordinate officials are not always imputed to the state, but they may be if carried out as part of a "policy" established by the state. Pembaur v. City of Cincinnati, 475 U.S. 469, 106 S.Ct. 1292, 1298-99, 89 L.Ed.2d 452 (1986); City of Oklahoma City v. Tuttle, 471 U.S. 808, 105 S.Ct. 2427, 85 L.Ed.2d 791 (1985); Monell v. New York Department of Social Services, 436 U.S. 658, 694, 98 S.Ct. 2018, 2037, 56 L.Ed.2d 611 (1978); Bohen v. City of East Chicago, 799 F.2d 1180, 1188-89 (7th Cir.1986). A "policy" of diluting votes may be established by a demonstration that the Board's agents (the election judges) do so and that the Board, despite knowing of the practice, has done nothing to make it difficult.
 
 
 50
 The "policy" also may lie in the statutes the Board administers. If Illinois has adopted a canvassing system incapable of producing an honest vote even when the Board does its utmost, then the policy of the state is that honest voting is unnecessary or unimportant. That policy, if established, violates the Constitution under the many cases starting with Ex parte Virginia, 100 U.S. (10 Otto) 339, 348-49, 25 L.Ed. 676 (1880) (dealing with jury service, but establishing terms on which judicial officers may be held liable), and collected in Hennings, 523 F.2d at 864. Proof that the Board allows ghost voters to remain on the rolls is proof of facilitation. The resulting fraud may be attributable to the Board because the whole system is in the Board's care and therefore is state action. Hennings and Bodine hold that the foul-ups that are bound to occur in any election system from time to time do not violate the Constitution. They do not hint that a system designed from the ground up to ensure dishonest elections is of no constitutional concern. The Republican plaintiffs' complaint, read generously as it must be at this early stage, puts in question the design and administration of the whole system from registration through voting. If the plaintiffs can establish (or the defendants admit) that the system cannot produce honest elections when run according to its terms, or that the fraud depends on the complicity of the Board's agents, the plaintiffs are entitled to relief. The relief could include an order to act inconsistently with provisions of state law.
 
 
 51
 We have not overlooked what may appear to be a substantial question of standing. The Republican Party names half of the deputy registrars; one of the Commissioners is supposed to look after the Party's interests; in a sense the Republican Party is accusing itself of administering the election system poorly. How can it complain about its own creatures? The Party might be told to put its own house in order rather than sue. Yet the Party may be able to show that as a minority in a city in which the real competition is among factions of the Democratic Party, it is in no position to do anything--even to find 2,900 deputy registrars who are real Republicans. The structure of the Illinois election code may make it impossible for a minority party to ensure honest elections in Chicago. On top of that, one of the plaintiffs, Denise Barnes, is not an official of the Republican Party and sues as a voter in addition to being a candidate. We have an Article III "case or controversy", which the district court must adjudicate.
 
 V
 
 52
 It is long past time to hold honest elections in Chicago. The Board has admitted--in the proposed decree and in oral argument before this court--that its canvasses have facilitated fraud on election day. It has admitted that it can do more. It must do more in order to keep the commitment made to this court.
 
 
 53
 Since January 27, when we affirmed the district court's refusal to enter the proposed consent decree, the canvass has been held. Objections to the results of the canvass and proposals for improvements have been made in the Circuit Court of Cook County. The canvass of January 28 and 29 removed about 66,000 names from the lists. According to the Board, about 5,000 of these removals were erroneous. Some of the Hayes plaintiffs, joined by voters struck from the lists, asked the circuit court for relief, contending that tens of thousands of the deletions were erroneous. The Board promised to establish 2,900 "restoration officers"--one per precinct, paid $125 each--to reenroll voters on election day. The circuit court, however, refused to allow this--both because of the lateness of the hour and because neither the Board nor the court possessed the power to alter, by consent, the voting procedures established by the legislature. The circuit court instead ordered the Board to provide the election judges at each polling place with the materials necessary to decide whether a person's eligibility to vote should be restored. Ortiz v. Board of Election Commissioners, No. 87 CH 01144 (Cir.Ct. Cook County Feb. 17, 1987). Several intervenors, including one controlled by the Republican Party, appealed, and the Appellate Court of Illinois affirmed.
 
 
 54
 The Board tentatively agreed with the Republican intervenor in the circuit court to conduct re-canvasses of more than 1,000 precincts. Presumably easier restoration on election day made such re-canvasses more attractive. The circuit court declined to allow the intervention to encompass the canvass, however, limiting the case to the claims of the Hayes plaintiffs about wrongful deletions during the canvass. We assume, however, that the Republican plaintiffs are free to file a separate case in the circuit court to obtain the benefit of that court's "broad supervisory powers", powers the U.S. District Court lacks.
 
 
 55
 The ongoing proceedings in state court do not eliminate the basis of this federal suit. The circuit court has so far declined to address the conduct of the canvass. The district court will be available to hear any claims not blocked by principles of preclusion (res judicata and collateral estoppel) if the Republican plaintiffs pursue that claim later. We trust that in some forum, state or federal, the Board will fulfill the commitment made to this court to crack down on fraud. Surely it can provide the deputy registrars with better training, police protection, and pay; it can send more watchers (including the Board's staff) to accompany the canvassers and monitor their work; it can zealously prosecute shirkers. The Board also can seek changes in its organic legislation, such as moving the canvass dates to a weekend and increasing the maximum payment to deputy registrars. If these changes do not work, if the case is not settled, and if the plaintiffs prove their case, if principles of preclusion allow, the district judge has still other options. All we need do today, however, is explain why the refusal to enter the consent decree was
 
 
 56
 AFFIRMED.
 
 On Petition for Rehearing
 
 57
 Per Curiam.
 
 
 58
 The Board's petition for rehearing calls our attention to a recent amendment to the Illinois Election Code that was not discussed in any of the parties' briefs. Ill. Rev. Stat. ch. 46 Sec. 6-59 now provides:
 
 
 59
 The Board of Election Commissioners on its own initiative, or upon order of the Circuit Court, shall at all times have authority to conduct investigations and to make canvasses of the registered voters in any precinct or precincts within its jurisdiction either by the methods provided by this article or at other times or by other methods than those prescribed herein.
 
 
 60
 This could mean that the Board has the authority to replace the machinery specified elsewhere in the Code or only to supplement it. The broadest reading of Sec. 6-59 would eliminate the concern expressed in Part III.7 of our opinion that the consent decree commits the Board to violate Illinois law. A more narrow reading would alleviate part of that concern. We do not know the legislative history of this statute, and the parties have not joined issue on its meaning. In conducting proceedings on remand, the district court should consider the effect of Sec. 6-59 on any future agreement the parties may reach.
 
 
 61
 In light of this addition to the opinion, the judges have voted unanimously to deny the Board's petition for rehearing.
 
 APPENDIX
 
 62
 NOTE: OPINION CONTAINS TABLE OR OTHER DATA THAT IS NOT VIEWABLE
 
 TEMPORARY ORDER
 
 63
 The district court declined to enter a consent decree that would have established a system of "District Court Observers" to monitor the canvass of voters registered in Chicago. The regular canvass is scheduled, by statute, for January 28 and 29, 1987. The district court deemed the proposals of the decree to be impracticable on this short notice. Our standard of review is abuse of discretion. Donovan v. Robbins, 752 F.2d 1170, 1177 (7th Cir.1985). In light of the fact that the Board of Election Commissioners has recently altered its policies to allow observers selected by political parties to accompany election judges on the canvass, we cannot conclude that Judge Duff abused his discretion. The Board conceded at oral argument both that prior canvasses have been inadequate to prevent fraud and that it has the authority to implement additional anti-fraud procedures; we expect it to act promptly on these concessions. Consequently, and without addressing the merits of this case in any way, we affirm the district court's discretionary decision not to approve the decree. A full opinion will follow in due course.
 
 
 64
 AFFIRMED.
 
 
 
 *
 Because of the emergency nature of the appeal, the panel issued a brief decision, which is attached as an appendix, on the date of oral argument
 
 
 **
 See Secs. 6-32, 14-3.1, 14-4. There is a glitch in the statutory cross-references. Section 6-32 states that deputy registrars shall be selected "in the manner and for the same term provided for judges of election by Sections 14-2 and 14-3 ... and have the qualifications provided for judges of election by Section 14-1". Laws 1965, p. 3481 Sec. 1. Two years later the legislature repealed Secs. 14-2 and 14-3 without amending Sec. 6-32. The replacement sections dealing with judges of election are Secs. 14-3.1 to 14-5. We assume that these new sections also apply to deputy registrars