RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206
File Name: 12a0359p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT
_____

**No. 12-3916**

NORTHEAST OHIO COALITION FOR THE
HOMELESS; SERVICE EMPLOYEES
INTERNATIONAL UNION, LOCAL 1199,
     *Plaintiffs-Appellees*,
OHIO DEMOCRATIC PARTY,
    *Intervenor Plaintiff-Appellee*,


v.


JON HUSTED; STATE OF OHIO,
     *Defendants-Appellants*.

**No. 12-4069**

SERVICE EMPLOYEES INTERNATIONAL UNION
LOCAL 1, et al.
     *Plaintiffs-Appellees*,


v.


JON HUSTED,
    *Defendant-Appellant*,

STATE OF OHIO,
     *Intervenor*.

> Nos. 12-3916/4069

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
Nos. 2:06-cv-00896; 12:-cv-00562—Algenon L. Marbley, District Judge.

Argued: October 1, 2012

Decided and Filed: October 11, 2012

Before: GIBBONS and COOK, Circuit Judges; ROSENTHAL, District Judge[*]

_____

[*] The Honorable Lee H. Rosenthal, United States District Judge for the Southern District of Texas, sitting by designation.

1

_____

**COUNSEL**

**ARGUED:** Stephen P. Carney, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants in 12-3916. Danielle Leonard, ALTSHULER BERZON LLP, San Francisco, California, for Appellees in 12-3916. Aaron D. Epstein, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant in 12-4069. Danielle Leonard, ALTSHULER BERZON LLP, San Francisco, California, for Appellees in 12-4069. Frederick D. Nelson, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Intervenor in 12-4069. **ON BRIEF:** Stephen P. Carney, Peggy Corn, Aaron D. Epstein, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellants in 12-3916. Danielle Leonard, Stephen P. Berzon, Stacey Leyton, Barbara Chisholm, ALTSHULER BERZON LLP, San Francisco, California, Caroline Gentry, Daniel B. Miller, PORTER, WRIGHT, MORRIS & ARTHUR LLP, Dayton, Ohio, Subodh Chandra, THE CHANDRA LAW FIRM, LLC, Cleveland, Ohio, Michael J. Hunter, HUNTER, CARNAHAN, SHOUB, BYARD & HARSHMAN, Columbus, Ohio, Donald J. McTigue, Mark A. McGinnis, McTIGUE LAW GROUP, Columbus, Ohio, for Appellees in 12-3916. Aaron D. Epstein, Erin Butcher-Lyden, Peter K. Glenn-Applegate, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellant in 12-4069. Danielle Leonard, Stephen P. Berzon, Stacey Leyton, Barbara Chisholm, ALTSHULER BERZON LLP, San Francisco, California, Michael J. Hunter, Cathrine J. Harshman, HUNTER, CARNAHAN, SHOUB, BYARD & HARSHMAN, Columbus, Ohio, for Appellees in 12-4069. Frederick D. Nelson, Richard N. Coglianese, Michael J. Hendershot, Stephen P. Carney, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Intervenor in 12-4069. Majeed G. Makhlouf, Joseph W. Boatwright, IV, CUYAHOGA COUNTY DEPARTMENT OF LAW, Cleveland, Ohio, Bassel C. Korkor, ARNOLD & PORTER LLP, Washington, D.C., Patrick T. Lewis, BAKER & HOSTETLER LLP, Cleveland, Ohio, Elizabeth Petrela Papez, Eric M. Goldstein, WINSTON & STRAWN LLP, Washington, D.C., for Amici Curiae in 12-4069.

_____

**OPINION**

_____

PER CURIAM. These consolidated election law appeals present constitutional challenges to Ohio's strict application of its disqualification rules for nonconforming provisional ballots to those caused by poll-worker error, as well as issues involving the validity of a federal court's consent decree that abrogates state law without finding violations of federal law. At issue are Ohio's requirements that provisional ballots be cast in the correct precinct and with a completed voter affirmation, making no exception

for wrong-precinct and deficient-affirmation ballots caused by poll-worker error. *See* O.R.C. §§ 3505.183(B)(4)(a)(ii)–(iii) and (B)(4)(b)(ii). Given the time-sensitive nature of these appeals with the November election approaching, we ordered expedited briefing and conducted a telephonic argument on October 1.

Appeal 12-3916 stems from the district court's denial of the state's motion to vacate a 2010 consent decree that requires the counting of certain wrong-precinct and deficient-affirmation provisional ballots where poll-worker error caused the nonconformity. Under the consent decree, this remedy applies only to voters that use the last four digits of their social security number ("SSN-4 voters") for identification to cast their provisional ballots. The Ohio Secretary of State and the State (collectively "State defendants" or "State appellees") both appeal this judgment. Appeal 12-4069 arises from the district court's preliminary injunction that requires the counting of all wrong-precinct and deficient-affirmation provisional ballots to remedy Ohio's systemic exclusion of nonconforming ballots caused by poll-worker error. The Secretary contests only the deficient-affirmation aspect of the preliminary injunction; the State as intervenor-appellant challenges the injunction's wrong-precinct remedy. Absent the preliminary injunction or consent decree, Ohio would not count any wrong-precinct or deficient-affirmation provisional ballots, regardless of poll-worker error. *See* O.R.C. §§ 3505.183(B)(4)(a)(ii)–(iii) and (B)(4)(b)(ii).

For the following reasons, we sustain part of the preliminary injunction in appeal 12-4069, AFFIRMING the wrong-precinct remedy and REVERSING the deficient-affirmation remedy. The district court's judgment in No. 12-3916 is AFFIRMED, and the matter is REMANDED so that the district court may expeditiously address (1) the equal protection issue created by the consent decree's provision for the counting of deficient-affirmation ballots by SSN-4 voters, and (2) a motion to modify the consent decree in light of the equal protection concerns raised by the consent decree's differential treatment of provisional ballots.

## I.  BACKGROUND

*A.  Facts Related to Appeal 12-3916:  The Consent Decree*

As the district court recognized, the consent decree arose from the "turbulent saga of Ohio's  provisional voting regime" that began in 2006 when Ohio enacted comprehensive election reforms.  (No. 2:12-CV-562, R. 67, Plenary Op. & Order at 2.)  Because we previously detailed the consent decree's history in *Hunter v. Hamilton County Board of Elections*, 635 F.3d 219, 223–24 (6th Cir. 2011), we review only the relevant parts.

In 2006, the Northeast Ohio Coalition for the Homeless and the Service Employees International Union Local 1199 (collectively "NEOCH plaintiffs" or "NEOCH appellees") filed suit against Ohio's Secretary of State challenging numerous aspects of Ohio's new voter-identification laws.  After lengthy negotiations, the NEOCH plaintiffs settled their claims with then-Secretary of State Jennifer Brunner by entering into a consent decree.  Though the consent decree stopped short of finding constitutional violations, it provided the following injunctive relief for SSN-4 voters: the State would not reject provisional ballots that, due to poll-worker error, were cast (1) in the wrong precinct but correct polling place, or (2) with nonconforming or incomplete ballot affirmations.  (No. 2:06-cv-896, R. 210, Consent Decree ¶ 5(b)(v), (vi).)  As explained in *Hunter*,

> The consent decree, in effect, carved out an exception for counting provisional ballots otherwise invalid under Ohio law if the deficiency was due to poll-worker error—albeit a narrow one limited to those provisional ballots cast by a voter who uses the last four digits of his or her Social Security number as identification.

635 F.3d at 224.  By its terms, the consent decree remains in effect until June 30, 2013 unless modified.

The State did not object to the consent decree's remedy until the Ohio Supreme Court issued a 2011 decision holding that Ohio's election laws offered no protections for wrong-precinct provisional ballots caused by poll-worker error.  *State ex rel. Painter*

*v. Brunner*, 941 N.E.2d 782, 794 (Ohio 2011) (per curiam).  After *Painter*, the State defendants returned to district court seeking to vacate the consent decree, citing a conflict between state law and the consent decree's remedies. Moreover, the State defendants argued that the consent decree was void *ab initio* because the Secretary of State lacked the unilateral authority to abrogate state law in the absence of a federal constitutional violation.   (Again, the consent decree did not find constitutional violations.) In the meantime, a different group of plaintiffs, whose claims we will discuss next, challenged the consent decree's preferential treatment of SSN-4 voters in separate litigation.  Responding to this emerging issue, the NEOCH plaintiffs also moved to modify the consent decree, seeking to expand its remedy to all provisional voters (not just SSN-4 voters) in order to prevent its disparate vote-counting standards from causing constitutional violations.

By opinion and order of July 9, 2012, the district court denied the State defendants' motion both on issue preclusion grounds and on the merits. Specifically, the district court rejected the State defendants' argument that the consent decree irreconcilably conflicted with state law, as pronounced in *Painter* and *State ex rel. Skaggs v. Brunner*, 900 N.E.2d 982 (Ohio 2008).  Citing *Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 614 (6th Cir. 2011), the district court also held that Federal Rule of Civil Procedure 60(b) governed the State defendants' motion to vacate the consent decree.  Because State defendants failed to show that the consent decree was no longer necessary to prevent constitutional violations, the district court held that they had not shown grounds for relief under Rule 60(b)(4) and (b)(5).  The district court withheld judgment on the NEOCH plaintiffs' motion to expand the consent decree at this time.

The State defendants timely appealed.   The Ohio Democratic Party, which intervened as a co-plaintiff at the district court, joins the NEOCH plaintiffs as appellees.

*B. Facts Related to Appeal 12-4069: The Preliminary Injunction*

On June 22, 2012, several unions and a community organizing group (collectively the "SEIU plaintiffs" or "SEIU appellees")[1] filed suit against Ohio's current Secretary of State Jon Husted, as well as members of the Cuyahoga County, Franklin County, and Hamilton County Boards of Elections. The SEIU plaintiffs allege that Ohio Rev. Code §§ 3505.183(B)(4)(a)(ii)–(iii) and (B)(4)(b)(ii), as interpreted by the Ohio Supreme Court, automatically disqualified wrong-precinct and deficient-affirmation provisional ballots, despite evidence that poll-worker error caused the ballot deficiencies. According to the SEIU plaintiffs, Ohio's strict application of the disqualification rules to ballot deficiencies caused by poll-worker error violated, *inter alia*, the Fourteenth Amendment's Equal Protection and Due Process Clauses. The SEIU plaintiffs also alleged that the consent decree's preferential treatment of SSN-4 voters' wrong-precinct and deficient-affirmation ballots violated equal protection. The SEIU plaintiffs moved for a preliminary injunction, arguing that the relevant statutory provisions impermissibly burdened the fundamental right to vote without serving sufficient state interests. To remedy this problem, the SEIU plaintiffs proposed "remaking" wrong-precinct provisional ballots to count only "up-ballot" votes—i.e., votes in eligible races.

The district court held an evidentiary hearing on July 30, 2012, and issued its preliminary injunction on August 27, 2012. As necessary for the issuance of a preliminary injunction, the court's 58-page Plenary Opinion and Order assessed the SEIU plaintiffs' likelihood of success on the merits of their constitutional claims, as well as the equitable factors necessary for injunctive relief: irreparable harm, harm to others,

---

[1] The plaintiffs consisted of the Service Employees International Union, Local 1; the United Steel, Paper and Forestry, Rubber, Manufacturing, Energy, Allied Industrial and Service Workers International Union; the International Union, United Automobile, Aerospace and Agricultural Implement Workers of America, including Locals 863 and 1005; and the Ohio Organizing Collaborative.

and the public interest.  The court premised injunctive relief upon three likely equal protection violations and a likely due process violation.**2**

### 1. Equal Protection: Wrong-Precinct Ballots Caused by Poll-Worker Error

Beginning with the SEIU plaintiffs' wrong-precinct ballots claim, the court found reliable evidence that Ohio's county election boards disqualified thousands of wrong-precinct ballots in each of Ohio's three most recent elections.  Specifically, the court found that Ohio rejected more than 14,000 wrong-precinct ballots in 2008 and 11,000 more in 2010, with wrong-precinct rejections occurring in the vast majority of Ohio counties.  (Plenary Op. & Order at 26 & n.28, 27 (counting 14,335 wrong-precinct rejections in 2008 and 11,775 in 2010).)  And in the mid-cycle election of 2011, which involved no federal races, Ohio kept specific data regarding right-place/wrong-precinct ballots revealing that Ohio disqualified more than 1,800 such ballots.   But for the consent decree entered in the *NEOCH* litigation, Ohio would have disqualified another 1,500 such ballots.  (*Id.* at 25–26 (finding that Ohio disqualified 1,826 of 3,380 right-place/wrong-precinct ballots in 2011).)  This data led the court to conclude that "[w]hile the number and frequency of wrong-precinct ballot disqualifications vary county to county, the problem as a whole is systemic and statewide." (*Id.* at 26.)  The court noted that "[m]uch of the factual basis upon which the Court relies for its findings is uncontested, or has already been established by this Court or the courts in [the *Hunter* litigation]."  (*Id.* at 25.)

Though the Secretary did not dispute the accuracy of these statistics, it challenged their relevance in light of recent efforts to improve Ohio's provisional ballot system.  The Secretary also argued that reasons other than poll-worker error may have caused some of the wrong-precinct ballots.  The district court rejected these arguments, citing the failure of previous state directives and the absence of evidence that voters disobeyed poll-worker instructions regarding voting precincts.  "No party," it stated,

---

**2**The district court rejected the SEIU plaintiffs' third equal protection claim asserting a greater burden on voters in more populous urban counties, finding insufficient evidence that Ohio's disqualification of wrong-precinct ballots disproportionately affects voters in those counties.  The SEIU appellees do not contest this finding.

"has identified a single example, from the past four years' elections, of a wrong-precinct provisional ballot being cast because the voter refused to vote in the correct precinct." (*Id.* at 29.)  Invoking poll workers' statutory mandate to direct voters to the correct precinct and inform them that wrong-precinct votes will not count, *see* O.R.C. § 3505.181(C)(1), the district court reasoned, "It is common sense that no rational voter who arrives at the correct polling place would ever *refuse* to cast a provisional ballot in the correct precinct . . . ."  (Plenary Op. & Order at 29.)  "Based on the record evidence provided thus far," the court concluded that "Plaintiffs ha[d] established a strong likelihood that thousands of lawfully-registered voters will be completely deprived of their right to vote under Ohio Rev. Code § 3505.183(B)(4)(a)(ii) in the upcoming election because of poll-worker error."  (*Id.* at 30.)

Deeming this burden "arbitrary," "irreversible," and "severe," the court proceeded to weigh the state interests justifying the automatic disqualification of wrong-precinct provisional ballots under the balancing test set forth in *Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983), and *Burdick v. Takushi*, 504 U.S. 428, 434 (1992).  To justify the automatic-disqualification rule, the Secretary relied on the "significant and numerous" advantages of the precinct voting system articulated in *Sandusky County Democratic Party v. Blackwell*, 387 F.3d 565, 569 (6th Cir. 2004) (per curiam): (1) capping the number of voters at a polling location; (2) limiting the precinct ballot to the applicable federal, state, and local elections a citizen may vote in, which has the result of (3) making the precinct ballot less confusing; (4) simplifying election administration and oversight, so as to minimize election fraud; and (5) enabling the state to place polling locations closer to voter residences.  The court deemed the first, third, and fifth *Sandusky* factors inapposite, because the automatic-disqualification rule affected voters who arrived at the right polling location and did nothing to make provisional ballots less confusing.  The second *Sandusky* factor—limiting precinct ballots to eligible races—somewhat justified the disqualification of wrong-precinct ballots in the court's view, inasmuch as the State has an interest in preventing ineligible voters from casting votes in the wrong races.  But because the SEIU plaintiffs sought to "remake" wrong-precinct ballots to count only "up-ballot" votes—a practice the court

noted had been employed by the consent decree since 2010—the court found no likelihood of vote dilution or detrimental effect on the precinct voting system. Finally, the court rejected for lack of evidence the Secretary's purported interest in election administration, monitoring, and recordkeeping. Citing *dicta* from this court's decision in *Hunter*, *see* 635 F.3d at 243 (expressing "substantial constitutional concerns regarding [Ohio's] invalidation of votes cast in the wrong precinct due solely to poll-worker error"), the district court concluded that the SEIU plaintiffs "have submitted reliable, uncontroverted evidence demonstrating that a discrete class of prospective voters will be severely burdened by [the disqualification of wrong-precinct provisional ballots caused by poll-worker error]." (Plenary Op. & Order at 39–40.)

In addition to its *Anderson/Burdick* balancing, the district court found Ohio's disqualification of right-place/wrong-precinct provisional ballots to constitute invidious discrimination because the restriction bore no relation to those voters' qualifications. *See, e.g.*, *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 666–67 (1966). Though Ohio's disqualification rule differed from the "archetypal case of an invidious restriction"—the poll taxes at issue in *Harper*—the district court reasoned that "[l]ike poll taxes . . . any rational basis for rejecting wrong-precinct ballots of registered voters due to poll-worker error is equally unreasonable," because the restriction "is unrelated to the prospective Plaintiffs' voter qualifications." (Plenary Op. & Order at 41.)

### 2. Equal Protection: Deficient-Affirmation Ballots Caused by Poll-Worker Error

Turning to the SEIU plaintiffs' claim regarding deficient-affirmation ballots, the court cited 2011 election data showing that Ohio rejected 568 provisional ballots due to such technical deficiencies as "a missing or misplaced printed name or voter signature, or the voter's signature was deemed not to match the exemplar on file with the Board." (*Id.* at 43.) The court attributed these deficiencies to poll-worker error "because it is the poll worker's duty to ensure that provisional ballots are cast with a validly completed ballot envelope and affirmation." (*Id.* (citing O.R.C. §§ 3505.181(B)(2)–(3), 3505.182).) Still, the court conceded that the class of affected voters "is likely to be significantly smaller" than the right-place/wrong-precinct ballots, and that the burden on these voters

"is arguably less severe" because "the individual voter has a greater degree of control over whether the ballot envelope contains the required elements." (*Id.* at 44.) While it could not "quantify the precise magnitude of the burden imposed by this law's restriction on the class of affected voters," it deemed the State's interests—the same *Sandusky* factors discussed above— insufficient to support the restriction under the *Anderson/Burdick* test. (*Id.* at 44–45.)

The Secretary argued that new directives, especially Directive No. 2012-01, mitigated the burden on these voters, but the district court disagreed, stating that the directive "instructs boards of elections that provisional ballots are not to be rejected only where the *poll worker* fails to fill out his or her portion of the provisional envelope." (*Id.* at 45.)

### 3. Equal Protection: The Consent Decree's Preferential Treatment of SSN-4 Ballots

Next, the district court agreed with the SEIU plaintiffs that Ohio's differential treatment of wrong-precinct ballots, depending on the form of identification used to cast the ballot, violated equal protection. Recognizing that the *NEOCH* consent decree provided a different vote-counting standard for SSN-4 provional ballots (allowing a chance to prove poll-worker error and have the vote counted) and all other provisional ballots (not), the court inquired whether state interests justified the preferential treatment. The State—by now seeking to vacate the consent decree—offered none, and the court agreed, finding "[t]here is no reason for treating provisional ballots differently based on the type of identification used." (*Id.* at 49.)

### 4. Due Process: Wrong-Precinct Ballots Caused by Poll-Worker Error

Last, the court adopted *dicta* from the post-remand judgment in the *Hunter* litigation that Ohio's strict disqualification of deficient ballots, regardless of poll-worker error, rendered the election system "fundamentally unfair," in violation of due process. *See Hunter v. Hamilton Cnty. Bd. of Elections*, 850 F. Supp. 2d 795, 847 (S.D. Ohio 2012). Relying on the same evidence discussed in the equal protection claims, the

district court found a strong likelihood that the SEIU plaintiffs would prevail on the due process claim.

> 5. *Injunctive Relief & Staying the NEOCH Plaintiffs' Motion to Modify the Consent Decree*

Having found a likelihood of success on the merits of these claims, the district court determined that the equitable factors favored the issuance of a preliminary injunction. Accordingly, the court granted a preliminary injunction requiring the counting of wrong-precinct and deficient-affirmation provisional ballots, unless the State could prove that the poll worker properly advised the voter to cast the ballot in the correct precinct and the voter refused. Having granted the broader relief of the preliminary injunction in the *SEIU* litigation, the district court stayed the NEOCH plaintiffs' motion to expand the consent decree in the *NEOCH* litigation, deeming that issue moot so long as the preliminary injunction remained in effect.

The Secretary now appeals the deficient-affirmation aspect of the preliminary injunction, and the State intervenes to appeal the wrong-precinct remedy.[3] The Citizens Reform Association of Cuyahoga County and individual voters appear as amici (collectively "CRACC amici") in favor of the State appellants,[4] and Common Cause Ohio, Cuyahoga County, and the League of Women Voters of Ohio appear as amici for the SEIU appellees. We have jurisdiction to hear both of these appeals. 28 U.S.C. § 1292.

---

[3] Alternatively, the State prematurely filed a separate appeal (12-4070) of the district court's preliminary injunction prior to becoming a party in the matter. We dismissed that appeal, but granted the State's motion to intervene in appeal 12-4069.

[4] CRACC amici previously attempted permissive intervention in the district court and intervention as of right in appeal 12-4069. The district court ruled their application untimely, and CRACC amici have appealed that ruling. (Appeal 12-4079.) Because that appeal remains pending and is the proper avenue to address the intervention arguments raised in the district court, we denied their motion to intervene on appeal and permitted their alternative request to file amicus briefs.

## II.  SCOPE OF PRELIMINARY INJUNCTION: THE WRONG-PRECINCT REMEDY

Before we may assess the propriety of the preliminary injunction, we must resolve a dispute over the scope of its relief for wrong-precinct ballots.  The district court's plenary opinion and order required the Secretary to instruct Ohio's county election boards not to reject provisional ballots "cast . . . in the wrong precinct, *unless* the poll worker who processed the voter's provisional ballot" directed the voter to the correct precinct, informed the voter of the ramifications of casting a wrong-precinct vote (disqualification), and the voter nevertheless insisted on casting the ballot in the wrong precinct.   (Plenary Op. & Order at 56–57.)  The SEIU appellees read this remedy to apply to all wrong-precinct ballots, regardless of whether the voter cast his or her ballot at the correct polling location. The State counters that the remedy applies only to provisional ballots cast at the correct polling place,  citing the district court's later clarifying orders.  The Secretary, who does not appeal this aspect of the preliminary injunction, ostensibly adopted the State's position on the scope of the preliminary injunction in Directive Number 2012-44, noting that the injunction's wrong-precinct remedy applied only to "ballots cast in the correct polling place but wrong precinct." *See* SOS Directive No. 2012-44 (referring to the affected ballots as "Right Church/Wrong Pew" ballots).  With one small caveat, we agree with the State.

The State correctly notes that significant portions of the district court's opinion specifically address the right-place/wrong-precinct problem.  For instance, the district court's burden analysis cites statistics for right-place/wrong-precinct provisional ballots cast during the 2011 general election, concluding that "[t]here is, then, a high statistical probability that in the upcoming election thousands of lawfully-registered voters will arrive at the correct polling place only to receive a provisional ballot from the poll worker for the wrong precinct." (Plenary Op. & Order at 26.)[5]  Elsewhere, the court states that "[t]he evidence further confirms that, of the thousands of rejected wrong-

---

[5]The statistics from prior elections do not distinguish between right-place/wrong-precinct ballots and wrong-place/wrong-precinct ballots because "[t]he Secretary did not begin requiring Boards to separately report [those numbers] until the 2011 general election." (Plenary Op. & Order at 26 n.27 (citation omitted).)

precinct/correct location provisional ballots, the vast majority will be disqualified as a result of poll-worker error." (*Id.* at 28–29.) And later on in its invidiousness analysis, the court notes that "[t]he Plaintiffs sue on behalf of registered voters who arrive in the correct polling place, and only through an intervening error violate the precinct requirement." (*Id.* at 41.)

Admittedly, the SEIU plaintiffs did not confine their requested relief to right-place/wrong-precinct provisional ballots. (*See* R. 63, SEIU Pls.' Second Am. Compl. at 35–36; R. 4, Mot. Prelim. Inj. at 4–5.) And certain aspects of the district court's opinion appeared to follow this lead—namely, the court's summary of the SEIU plaintiffs' requested relief and the court's "order" of "Appropriate Injunctive Relief." (Plenary Op. & Order at 12, 56–57.) But if any doubt remained, the district court's framing of its equal-protection analysis settles the matter: "It is the particular burden imposed by Ohio's prohibition of wrong-precinct ballots on the rights of a 'discrete class of prospective voters'—those who *arrive at the correct polling place* but are misdirected due to poll-worker error—against which the State's asserted interests must be weighed." (*Id.* at 34 (emphasis added) (citation omitted); *see also id.* at 37 n.56 (weighing state interests in disqualifying right-place/wrong-precinct provisional ballots).)

Two additional pieces of extrinsic evidence support this view. First, the district court issued three post-injunction orders—two scheduling orders and an order granting the State's motion to intervene—that characterized the preliminary injunction's wrong-precinct remedy as extending no further than ballots miscast from the correct polling place. Second, the SEIU appellees conceded at oral argument that they never sought to have wrong-county provisional ballots counted, but that would be the practical effect of granting their interpretation of the district court's wrong-precinct remedy.

Rather than presume the district court intended a "vote anywhere" remedy, we take the court at its word that it considered the constitutionality of the State's disqualification of right-place/wrong-precinct provisional ballots. We therefore read the district court's wrong-precinct remedy to encompass only those votes. Consequently,

our remaining discussion of wrong-precinct ballots and the wrong-precinct remedy addresses only right-place/wrong-precinct provisional ballots.**6**

We do note, however, that the State's interpretation fails to account for provisional ballots cast at the county boards of election. Because Ohio law authorizes the casting of provisional ballots at the county boards, *see* O.R.C. § 3505.181(C)(2) (disqualifying certain provisional ballots where "the individual refuses to travel to the polling place for the correct jurisdiction *or to the office of the board of elections* to cast a ballot" (emphasis added)), we see no reason to distinguish these right-place/wrong-precinct provisional ballots from those cast at precinct polling locations. In both instances, the voter appears at a state-authorized polling location, but the alleged poll-worker error results in the casting of a wrong-precinct provisional ballot. Accordingly, we assume the district court's wrong-precinct remedy includes these right-place/wrong-precinct provisional ballots.

### III.  THE PRELIMINARY INJUNCTION (Appeal 12-4069)

*A.  Standard of Review*

Our review focuses on the four factors a plaintiff must establish to receive injunctive relief:

> (1) whether the movant has a strong likelihood of success on the merits;
> (2) whether the movant would suffer irreparable injury without the injunction;
> (3) whether issuance of the injunction would cause substantial harm to others; and
> (4) whether the public interest would be served by the issuance of the injunction.

*Hunter*, 635 F.3d at 233 (quoting *Certified Restoration Dry Cleaning Network*, *L.L.C. v. Tenke Corp.*, 511 F.3d 535, 542 (6th Cir. 2007)). At the preliminary injunction stage,

---

**6**Our ruling does not preclude the SEIU appellees or others from seeking broader relief for poll-worker-induced wrong-place/wrong-precinct provisional ballots upon a showing that Ohio's law unconstitutionally burdens those voters' rights. As those issues are not before us, we express no view on their merits.

"a plaintiff must show more than a mere possibility of success," but need not "prove his case in full." *Certified Restoration Dry Cleaning Network*, 511 F.3d at 543 (citations omitted). "[I]t is ordinarily sufficient if the plaintiff has raised questions going to the merits so serious, substantial, difficult, and doubtful as to make them a fair ground for litigation and thus for more deliberate investigation." *Six Clinics Holding Corp., II v. Cafcomp Sys., Inc.*, 119 F.3d 393, 402 (6th Cir. 1997) (citation omitted).

The State argues for a higher evidentiary burden, characterizing the SEIU plaintiffs' claims as presenting only a facial attack on Ohio Rev. Code §§ 3505.183(B)(4)(a)(ii)–(iii) and (B)(4)(b)(ii). No doubt, certain aspects of the SEIU plaintiffs' Second Amended Complaint appear to present facial challenges, but others advance as-applied challenges focusing on these statutes' failure to make exception for poll-worker error. (*See* SEIU Pls.' Second Am. Compl. ¶¶ 79, 82 (challenging the State's rationale for excluding wrong-precinct and deficient-affirmation ballots caused by poll-worker error).) We read the district court's opinion as sustaining these as-applied claims and therefore limit our review accordingly.

Though we consider the ultimate decision to issue the injunction under a deferential abuse-of-discretion standard, we assess the underlying legal conclusions *de novo* and factual findings for clear error. *Obama for America v. Husted*, — F.3d —, Nos. 12-4055/4076, slip op. at 6 (6th Cir. 2012). Consequently, we give fresh review to the district court's legal conclusions regarding a plaintiff's likelihood of success on the merits. *Id.* at 7; *Hunter*, 635 F.3d at 233. An injunction "will seldom be disturbed unless the district court relied upon clearly erroneous findings of fact, improperly applied the governing law, or used an erroneous legal standard." *Mascio v. Pub. Emps. Ret. Sys. of Ohio*, 160 F.3d 310, 312 (6th Cir. 1998).

## B. The Wrong-Precinct Ballots

### 1. Likelihood of Success on the Merits

The district court identified three strands of likely constitutional violations related to the wrong-precinct ballots as requiring injunctive relief: the unreasonableness

and fundamental unfairness of disqualifying wrong-precinct ballots caused by poll-worker error (equal protection and due process), and the disparate treatment of deficient provisional ballots under the consent decree (equal protection). Having reviewed the record afresh, we agree on all counts.

### a. Equal Protection & Disqualification Despite Poll-Worker Error

Our Constitution accords special protection for the fundamental right of voting, *Harper*, 383 U.S. at 670, recognizing its essential role in the "preservati[on] of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). Because "[o]ther rights, even the most basic, are illusory if the right to vote is undermined," *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964), "'[t]he right to vote is protected in more than the initial allocation of the franchise. Equal protection applies as well to the manner of its exercise,'" *League of Women Voters v. Brunner*, 548 F.3d 463, 477 (6th Cir. 2008) (quoting *Bush v. Gore*, 531 U.S. 98, 104 (2000)). At the same time, the Constitution vests states with the authority to prescribe "[t]he Times, Places and Manner of holding Elections for Senators and Representatives." U.S. Const. Art. I, § 4, cl. 1. "[W]hen a state election law provision imposes only 'reasonable, nondiscriminatory restrictions' upon the First and Fourteenth Amendment rights of voters, 'the State's important regulatory interests are generally sufficient to justify the restrictions." *Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 788). When equal protection challenges ask us to resolve these competing interests, we calibrate the equal protection standard to "[t]he precise character of the state's action and the nature of the burden on voters." *Obama for America*, Nos. 12-4055/4076, slip op. at 8 (citing *Biener v. Cailo*, 361 F.3d 206, 214 (3d Cir. 2004) for the proposition that "[t]he scrutiny test depends on the [regulation's] effect on [the plaintiff's] rights.").

While a rational basis standard applies to state regulations that do not burden the fundamental right to vote, strict scrutiny applies when a state's restriction imposes "severe" burdens. *Id.* (citing *McDonald v. Bd. of Election Comm'rs,* 394 U.S. 802, 807–09 (1969) and *Burdick*, 504 U.S. at 434). For the majority of cases falling between these extremes, we apply the "flexible" *Anderson/Burdick* balancing test. *Id.*; *see also*

*Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 189–91 (2008) (Stevens, J., joined by Roberts, C.J., and Kennedy, J., announcing the judgment of the Court); *id.* at 211 (Souter, J., joined by Ginsburg, J., dissenting).

The State defendant, intervening as appellant, resists this standard, arguing that Ohio's automatic-disqualification rule for wrong-precinct ballots treats all voters equally and therefore does not "involve any classification that could violate the equal protection standard." But the State overlooks the fact that a clear majority of the Supreme Court in *Crawford* applied some form of *Burdick*'s burden-measuring equal protection standard to Indiana's facially neutral voter-identification requirement. *See* 553 U.S. at 189–91 (Stevens, J., announcing the judgment of the Court), 204 (Scalia, J., joined by Alito and Thomas, JJ., concurring in the judgment) ("To evaluate a law respecting the right to vote—whether it governs voter qualifications, candidate selection, or the voting process—we use the approach set out in *Burdick* . . . ."), 211 (Souter, J., dissenting). Because the SEIU plaintiffs "demonstrated that their right to vote is . . . burdened by" Ohio's law that rejects wrong-precinct ballots regardless of poll-worker error, "[t]he *Anderson-Burdick* standard . . . applies." *Obama for America*, Nos. 12-4055/4076, slip op. at 10 (rejecting Ohio's attempt to limit the *Anderson/Burdick* test to First Amendment free association claims and Fourteenth Amendment due process claims).

Following the *Anderson/Burdick* test,

[we] must weigh "the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate" against "the precise interests put forward by the State as justifications for the burden imposed by its rule," taking into consideration "the extent to which those interests make it necessary to burden the plaintiffs' rights."

*Burdick*, 504 U.S. at 434 (quoting *Anderson*, 460 U.S. at 789)). "There is no litmus test to separate valid from invalid voting regulations; courts must weigh the burden on voters against the state's asserted justifications and make the hard judgment that our adversary system demands." *Obama for America*, Nos. 12-4055/4076, slip op. at 9 (internal

quotation marks omitted) (quoting *Crawford*, 553 U.S. at 190 (Stevens, J., announcing the judgment of the Court)).

### i. The Burden on Provisional Voters

Here, the district court identified a substantial burden on provisional voters. The court's factual findings detail Ohio's "systemic" disqualification of thousands of wrong-precinct provisional ballots and a strong likelihood that the majority of these miscast votes result from poll-worker error. To recap, Ohio tossed out more than 14,000 wrong-precinct ballots in 2008 and 11,000 more in 2010, with such rejections occurring across the state. And in the mid-cycle election of 2011, Ohio disqualified more than 1,800 right-place/wrong-precinct ballots—1,500 fewer than it would have rejected in the absence of *NEOCH* consent decree.[7] Like the Secretary before the district court, the State intervening as appellant does not contest the accuracy of this data, but emphasizes that wrong-precinct ballots make up a small percentage of the total votes cast. (State Br. at 12 (explaining that wrong-precinct ballots made up 0.248% of the ballots cast in the 2008 election, with right-place/wrong-precinct ballots comprising an even smaller share).)

Though the district court did not make specific factual findings regarding the incidence of poll-worker error, it found such error evident in poll workers' statutory duty to direct voters to the correct polling place. *See* O.R.C. § 3505.181(C)(1).[8] As the State

---

[7]These findings regarding the statewide disqualification of wrong-precinct ballots amplify the countywide evidence established in *Hunter*. *See Hunter*, 635 F.3d at 237 (recognizing 269 right-place/wrong-precinct ballots in the November 2010 election for Hamilton County Juvenile Court Judge).

[8]This provision states:

> If an individual declares that the individual is eligible to vote in a jurisdiction other than the jurisdiction in which the individual desires to vote, or if, upon review of the precinct voting location guide using the residential street address provided by the individual, an election official at the polling place at which the individual desires to vote determines that the individual is not eligible to vote in that jurisdiction, *the election official shall [1] direct the individual to the polling place for the jurisdiction in which the individual appears to be eligible to vote, [2] explain that the individual may cast a provisional ballot at the current location but the ballot will not be counted if it is cast in the wrong precinct, and [3] provide the telephone number of the board of elections in case the individual has additional questions.*

O.R.C. § 3505.181(C)(1) (emphasis and brackets added).

acknowledges, Ohio law requires poll workers to "determine whether an individual is eligible to vote in a specific precinct, and direct them to the precinct in which 'the individual appears to be eligible to vote.'"    (State Br. at 12 (quoting O.R.C. § 3505.181(C)(1)).)  *See also Hunter*, 635 F.3d at 243 ("Ohio has created a system in which state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote.").  The court also cited the proliferation of multi-precinct polling locations in Ohio's counties as increasing the likelihood of poll-worker error causing right-place/wrong-precinct ballots.  (*See* Plenary Op. & Order at 6 n.10 (finding, as of the 2012 primaries, shared-polling place rates for the following counties' election precincts: Butler, 95%; Cuyahoga, 94%; Greene, 100%; Franklin County, 68%; Lorain, 90%; Montgomery, 88%; Stark County, 71%).)

In addition to these findings, the SEIU plaintiffs presented voluminous evidence that poll workers give voters wrong-precinct ballots for a number of reasons, ranging from misunderstanding counties' precinct location guides to failing to understand the vote-disqualifying ramifications of handing out wrong-precinct ballots.  This recent sample of Franklin County's precinct location guide, which shows how different house numbers on the same street end up in different precincts, almost at random, demonstrates how easily poll workers can make mistakes under the pressures of election day.

**POLL LOCATION STREET GUIDE**
PRINTED 01/30/2012 8:58:48 AM

| STREET NAME | HOUSE RANGE | CITY | PRECINCT |
|---|---|---|---|
| NORTH ALY | 100 ALL # TO 299 | BLACKLICK, 43004 | JEFFERSON-E |
| NORTH ALY | 5871 ODD # TO 5875 | BLACKLICK, 43004 | COLS 46-B |
| NORTH CT | 6712 EVEN # TO 6732 | COLUMBUS, 43229 | COLS 53-E |
| NORTH DR | 6702 ALL # TO 6756 | REYNOLDSBURG, 43068 | REYNS 1-A |
| NORTH ST | 100 ALL # TO 299 | BLACKLICK, 43004 | JEFFERSON-E |
| NORTH ST | 1 ODD # TO 99 | COLUMBUS, 43202 | COLS 39-B |
| NORTH ST | 2 EVEN # TO 100 | COLUMBUS, 43202 | COLS 39-B |
| NORTH ST | 0 ALL # TO 99 | DUBLIN, 43017 | DUB 2-A |
| NORTH ST | 108 ALL # TO 140 | GAHANNA, 43230 | GAH 2-D |
| NORTH ST | 5873 ODD # TO 5873 | GAHANNA, 43230 | COLS 46-B |
| NORTH ST | 6500 ALL # TO 6599 | GALLOWAY, 43119 | PRAIRIE-E |
| NORTH ST | 5200 ALL # TO 5299 | HILLIARD, 43026 | HILL 1-F |
| NORTH ST | 1 ODD # TO 199 | WESTERVILLE, 43081 | WESTERVILLE 3-B |
| NORTH ST | 2 EVEN # TO 200 | WESTERVILLE, 43081 | WESTERVILLE 2-F |
| E NORTH ST | 1 ODD # TO 157 | WORTHINGTON, 43085 | WORTH 4-A |
| E NORTH ST | 2 EVEN # TO 154 | WORTHINGTON, 43085 | WORTH 4-A |
| E NORTH ST | 156 EVEN # TO 586 | WORTHINGTON, 43085 | WORTH 4-B |
| E NORTH ST | 159 ODD # TO 191 | WORTHINGTON, 43085 | WORTH 4-A |
| E NORTH ST | 201 ODD # TO 585 | WORTHINGTON, 43085 | WORTH 2-B |
| W NORTH ST | 0 ALL # TO 199 | WORTHINGTON, 43085 | WORTH 1-B |

(R. 13-12 at 9.)  The Secretary failed to present evidence to the district court that other factors besides poll-worker error caused wrong-precinct ballots, and the State offers none now.  Given this record and the clear legal duty imposed on poll workers by Ohio law, the district court deduced:

> As a matter of law, if a person casts a provisional ballot in the wrong precinct, it is *always* going to be due to poll-worker error unless the poll worker has instructed the individual where the correct polling location is and that individual "refuses to travel to the polling place for the correct [precinct] or to the office of the board of elections to cast a ballot." Ohio Rev. Code §§ 3505.181(C)(2), 181(E)(1).  Such an act would be an irrational and futile exercise by the voter, because, as required by Ohio Rev. Code § 3505.181(C)(1), the poll worker must first inform him that if he insists on voting in the wrong precinct, his ballot will not be counted.

(Plenary Op. & Order at 8.)  Because the State offers no evidence of alternative causes, we find no clear error with the district court's factual conclusion that most right-place/wrong-precinct ballots result, and will continue to result, from poll-worker error.[9]

The application of Ohio Rev. Code §§ 3505.183(B)(4)(a)(ii) and (B)(4)(b)(ii) to right-place/wrong-precinct ballots caused by poll-worker error effectively requires voters to have a greater knowledge of their precinct, precinct ballot, and polling place than poll workers.  Absent such omniscience, the State will permanently reject their ballots without an opportunity to cure the situation.  The mere fact that these voters cast provisional ballots does not justify this additional burden; as the district court explained, Ohio law now requires thirteen different categories of voters to cast provisional ballots, ranging from individuals who do not have an acceptable form of identification to those who requested an absentee ballot or whose signature was deemed by the precinct official not to match the name on the registration forms.  *See* Ohio Rev. Code § 3505.181(A)(1)–(13).

### ii.  The State's Interests:  Sandusky *Factors*

Faced with this burden on voters, the State falls back on the same *Sandusky* factors rejected by the district court.  First, the State objects to the district court's conclusion that the first *Sandusky* factor—capping the number of voters at a polling place—does not support disqualifying right-place/wrong-precinct ballots.  We find no

---

[9]We note that the Secretary, in implementing the district court's wrong-precinct remedy, has prescribed a new election form for poll workers to document recalcitrant voters that refuse to go to the correct polling location:  SOS Form 12-D.  This form, known as the "Provisional Voter Precinct Verification Form," identifies five steps that poll workers must take "whenever a voter's name does not appear in the signature poll book or poll list, the voter is in the wrong precinct of the correct multiple-precinct polling place and the voter insists on casting a provisional ballot in the wrong precinct."  First, the poll worker must "[f]ind the voter's address in the Voting Location Guide."  At steps two and three, the poll worker must record the voter's correct precinct and the address of the correct polling place on the form.  The last two steps involve instructing the voter to go to the correct precinct to cast a provisional ballot and informing the voter that casting a wrong-precinct ballot at the current location will result in the disqualification of the ballot.  If the voter still insists on casting a ballot in the wrong precinct after receiving this advice, then the poll worker will complete the form's affirmation "under penalty of election falsification" to document that the voter disregarded the advice provided in the five steps.  The poll worker will then attach the completed form to the miscast ballot for purposes of verification.  The county board of election will reject the miscast ballot if the poll worker directed the voter to the correct precinct.

We do not view this measure as alleviating the SEIU plaintiffs' burden of establishing a likely constitutional violation, but we do find it relevant to weighing the state's asserted interests in preserving its strict disqualification rules in the face of SEIU's poll-worker-error claims.

error here.  By definition, right-place/wrong-precinct ballots *are* cast at the right polling location, demonstrating that these voters attempted to comply with the State's precinct requirement.  Of course, if a recalcitrant voter insists on casting a wrong-precinct ballot after making the effort to arrive at the correct polling place, the State would have a strong interest in rejecting that non-compliant vote.  But the State offers no evidence or logical support for this phenomenon, while the SEIU plaintiffs provided substantial evidence of poll-worker error.

As for the second and third *Sandusky* factors, the State argues that it has a strong interest in limiting precinct ballots to eligible races, which facilitates the administration of elections and simplifies the ballot for voters.  No disagreement there, but these interests do not justify the precise restriction challenged here: the exclusion of wrong-precinct ballots caused by poll-worker error.  Additionally, the State asserts "an interest in avoiding a circumstance in which voters are in effect given the option of surrendering their right to vote in 'down ballot,' precinct-specific races in exchange for the ability to cast 'up ballot' votes in a (perhaps less busy) precinct other than their own."  (State Br. at 48.)  Again, the State offers no evidence for this speculation. We have no reason to think that voters, who will be correctly advised by poll workers about their assigned precinct, *see* O.R.C. § 3505.181(C)(1) and SOS Directive No. 2012-44,[10] will opt to roll the dice in a less busy precinct on pain of having their votes disqualified.  The State offers no reason to think that the district court's limited relief for the narrow class of right-place/wrong-precinct ballots caused by poll-worker error—which has no effect on the design of precinct ballots—will undermine Ohio's precinct system or make ballots more confusing.

Turning to the fourth *Sandusky* factor, the State claims that the district court's remedy makes it more difficult to monitor the voting process and prevent election fraud. According to the State,

---

[10]The new election form prescribed by the Secretary, Form 12-D, further decreases the likelihood that opportunistic voters will engage in precinct-shopping, because voters will actually *see* poll-workers documenting non-compliance with poll-worker instructions.

> moving toward a system in which (absent new and affirmative evidentiary "verification" actions by the boards) the total potential number of provisional ballots that must be counted is not capped by reference to the number of registered voters assigned to a given precinct, or capable of estimation at any time until after the polls have closed would, almost by definition, make it more difficult for elections officials to monitor and keep up with the voting process.

(State Br. at 50.)  Not only will the injunction make it more difficult to administer the election on election day, the State argues, but it will make it more difficult for the State to comply with the federal safe harbor deadline for Presidential electors, December 11, 2012.  *See* 3 U.S.C. § 5; O.R.C. § 3515.041.  Beyond these administrative burdens, amici CRACC movants suggest that the district court's remedy opens the door to more poll-worker error, which will result in the dilution of proper votes via the counting of ineligible votes.  We find neither argument persuasive.

First, the record does not support the State's fear that the district court's limited remedy will increase the number of voters attempting to cast votes at the wrong polling location or facilitating voter fraud.  Barring substantial numbers of recalcitrant voters insisting on casting wrong-precinct votes—again, a phenomenon not supported by the record or logic—the district court's limited remedy should not burden poll workers with longer lines or tax county boards with an unmanageable number of ballot verifications after election day.  Second, neither the State nor amici present evidence that county boards err in remaking wrong-precinct ballots to count only votes in "up-ballot" races, despite the fact that county boards have followed the practice since the adoption of the consent decree in April 2010.  The State's chief election official, who adopted Directive No. 2012-44 and Form 12-D, apparently believes that poll workers and county boards can both implement the district court's injunctive relief and perform their other election duties within the time allotted.

### *iii.  Conclusion*

In sum, while the *Sandusky* factors reflect a state's legitimate interests in maintaining a precinct-based election system, the State does not show how these interests support the specific restriction challenged here: the summary rejection of poll-

worker-induced right-place/wrong-precinct ballots.  Because the State fails to identify precise interests justifying this substantial burden, we agree with the district court that the SEIU plaintiffs have shown a likely equal protection violation.

### *b. Due Process & Disqualification Despite Poll-Worker Error*

The voter burden identified by the SEIU plaintiffs likewise supports the district court's finding of a probable due process violation.  The Due Process Clause protects against extraordinary voting restrictions that render the voting system "fundamentally unfair."  *See, e.g.*, *Warf v. Bd. of Elections of Green Cnty., Ky.*, 619 F.3d 553, 559 (6th Cir. 2010); *League of Women Voters*, 548 F.3d at 478.  "[G]arden variety election irregularities" do not rise to that level, *Griffin v. Burns*, 570 F. 2d 1065, 1076 (1st Cir. 1978), but substantial changes to state election procedures and/or the implementation of non-uniform standards run afoul of due process if they "result in significant disenfranchisement and vote dilution," *Warf*, 619 F.3d at 559 (citations omitted).  So too do state actions that induce voters to miscast their votes.  *Griffin*, 570 F.2d at 1074, 1078–79 (finding that Rhode Island's post-election invalidation of absentee ballots violated due process, because voters relied on state directives allowing such ballots); *Hoblock v. Albany Cnty. Bd. of Elections*, 487 F. Supp. 2d 90, 97 (N.D.N.Y. 2006).

Although this issue was not ripe at the time, *Hunter* expressed "substantial constitutional concerns regarding the invalidation of votes cast in the wrong precinct due solely to poll-worker error."  635 F.3d at 243.

> Ohio has created a system in which state actors (poll workers) are given the ultimate responsibility of directing voters to the right location to vote. Yet, the state law penalizes the voter when a poll worker directs the voter to the wrong precinct, and the penalty, disenfranchisement, is a harsh one indeed. To disenfranchise citizens whose only error was relying on poll-worker instructions appears to us to be fundamentally unfair. *Cf.* [*Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006)] ("[T]he possibility that qualified voters might be turned away from the polls would caution any district judge to give careful consideration to the plaintiffs' challenges.").

*Id.* at 243. The SEIU plaintiffs have shown, and the State does not deny, that poll-worker error causes thousands of qualified voters to cast wrong-precinct ballots from the correct polling locations.

Even so, the State argues that a due process violation requires intentional conduct. *See, e.g.*, *Shannon v. Jacobowitz*, 394 F.3d 90, 96 (2nd Cir. 2005). It appears we have not opined on the scienter necessary for a voting restriction to violate due process, *see League of Women Voters*, 548 F.3d at 476 (declining to decide the scienter requirement for a voting restriction to violate equal protection), 478 (finding, at the 12(b)(6) stage, that allegations of systemic irregularities in Ohio's elections system supported a due process violation, without addressing scienter). Yet, accepting the State's premise, we find sufficient indicia of purposeful conduct in the State's intent to enforce its strict disqualification rules without exception, despite the systemic poll-worker error identified in this litigation and others. *Hunter* shed light on this problem last year, but the State persisted in its position. In light of the well-documented problem of wrong-precinct provisional ballots caused by poll-worker error, resulting in the rejection of thousands of provisional ballots each year, we have no basis on which to disagree with the district court's finding of a likely due process violation.

### c. Equal Protection & Consent Decree's Non-Uniform Standards

We next address the consent decree's differential treatment of provisional ballots depending on the form of identification used by the voters. As the district court explained, the Ohio Revised Code rejects all wrong-precinct ballots, but the consent decree provides a remedy only for SSN-4 voters. For those SSN-4 voters who later show that poll-worker error caused their wrong precinct or deficient-affirmation vote, the consent decree saves their ballots from rejection. A provisional voter using any other form of identification (e.g., current photo identification, copy of current utility bill, paycheck) receives no such reprieve.

Both the State and the SEIU plaintiffs addressed this issue before the district court. In arguing for an expansion of the consent decree, the SEIU plaintiffs objected to its "arbitrary and unequal counting and rejecting of the ballots of lawfully registered

Ohio voters."  (SEIU Pls.' Second Am. Compl. ¶ 94; Mot. Prelim. Inj. at 31.) The Secretary similarly acknowledged this equal protection problem in the consent decree, but argued that "it's equally plausible to say that the proper remedy is to treat everybody the same and do away with the NEOCH decree."  (R. 69, Tr. Oral Arg. at 58:11–17.) Though both parties continue to recognize this equal protection problem, they disagree on a fix.  The NEOCH plaintiffs likewise recognized this problem when they moved the district court to expand the consent decree to avoid constitutional infirmity.

We agree with all of the parties and the district court that the consent decree likely violates the equal protection principle recognized in *Bush v. Gore*.  "[A] citizen has a constitutionally protected right to participate in elections on an equal basis with other citizens in the jurisdiction."  *Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). "Having once granted the right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over that of another."  *Bush*, 531 U.S. at 104–05.  It appears to us that the consent decree does just that.

Our *Hunter* case noted a similar equal protection problem with this consent decree. There, the Hamilton County elections board "considered evidence of poll-worker error with respect to some ballots cast in the wrong precinct but not other similarly situated ballots when it evaluated which ballots to count."  *Hunter*, 635 F.3d at 238. *Hunter* recognized the possibility that Hamilton County's treatment of provisional ballots under the consent decree could create a statewide equal protection problem, but limited its analysis to the county-based equal protection claim brought by the parties. *See id.* at 241–42.

Here, the SEIU plaintiffs' equal protection claim squarely raises the statewide disparity inherent in the terms of the consent decree: its preferential treatment of SSN-4 provisional ballots.  (SEIU Pls.' Second Am. Compl. ¶ 94.) Consistent with *Hunter*, we join the parties and the district court in finding  that the consent decree's different treatment of similarly situated provisional ballots likely violates equal protection.

## 2. *Irreparable Injury, Substantial Harm to Others, Public Interest*

Turning to the equitable considerations, the State does not contest the district court's core findings of irreparable harm to the voter and absence of harm to others. Rather, it offers only vague public-interest concerns, speculating that the injunction will spawn additional poll-worker error, vote dilution, and post-election litigation. As we explained in rejecting the CRACC amici's vote-dilution argument, the record does not support the fear that county boards will err in remaking wrong-precinct ballots by improperly counting ineligible "down ballot" votes. Nor do we anticipate that the injunction's narrow remedy—saving "up-ballot" votes from poll-worker-induced wrong-precinct ballots—will spur a mountain of post-election litigation. The State has not shown that the district court abused its discretion in weighing the equitable considerations.

Nor has the State shown abuse in the district court's fashioning of injunctive relief tailored to the identified harm. The State would disqualify thousands of right-place/wrong-precinct provisional ballots, where the voter's only mistake was relying on the poll-worker's precinct guidance. That path unjustifiably burdens these voters' fundamental right to vote. Recognizing that a prospective remedy could not undo all of the harm occasioned by poll-worker error, the district court crafted a narrow remedy that preserves as much of a miscast ballot as possible. The Secretary has now adopted regulations implementing the district court's limited remedy for right-place/wrong-precinct provisional ballots. *See* SOS Directive 2012-44 & Form 12-D. These regulations enable the State to identify and document recalcitrant voters that disregard poll-workers' precinct instructions, so that these provisional ballots can be excluded. Because the State offers no persuasive reason to disturb the district court's remedy, as implemented by the Secretary, we affirm the wrong-precinct aspect of the preliminary injunction.

*C. The Deficient-Affirmation Ballots*

The district court identified only one probable constitutional violation as supporting the injunction's deficient-affirmation remedy: the unreasonableness of disqualifying deficient-affirmation ballots caused by poll-worker error, in derogation of equal protection. Because the spotty record and Ohio law do not support the district court's presumption of poll-worker error, we find no likely constitutional violation and reverse this aspect of the preliminary injunction.

The district court's opinion suffers from two presumptions not supported by the record: (1) that the absence of legitimate state interests overcomes any difficulty "quantify[ing] the precise magnitude of the burden imposed by [Ohio's] restriction on the class of affected voters," and (2) that state law requires poll-workers to ensure that provisional voters properly complete ballot affirmations. (Plenary Op. & Order at 44.) The district court's minimal findings on this count reflect that Ohio rejected 568 provisional ballots in 2011 due to technical deficiencies appearing in the ballot affirmations, but do not specify which of these ballots suffered from which deficiencies. To be sure, the SEIU plaintiffs grouped a variety of voter-penned errors in support of this claim—e.g., missing, misplaced, and non-matching signatures, and failure to include a printed name.

In our view, the difficulty in measuring the voter burden imposed by the ballot-affirmation requirement stems from the fact that all of the identified deficiencies arise from voters' failure to follow the form's rather simple instructions: (1) print name, (2) provide identification,[11] and (3) sign the affirmation appearing at the bottom. *See* SOS Form 12-B. Even the last step is optional, because Ohio law permits voters to cast a provisional ballot without signing the affirmation upon notifying a poll worker. O.R.C. § 3505.181(B)(6). Contrary to the district court's suggestion, Ohio law does not task poll-workers with quality control of ballot affirmations. Rather, the Ohio provisions cited by the district court instruct provisional voters to "execut[e] . . . a written

---

[11]The SEIU plaintiffs do not challenge Ohio's voter-identification requirements.

affirmation . . . before an election official," O.R.C. § 3505.181(B)(2), and require election officials to "record the type of identification provided, the social security number information, the fact that the affirmation was executed, or the fact that the individual declined to execute such an affirmation and include that information with the transmission of the ballot," O.R.C. § 3505.181(B)(6).

During oral argument, the SEIU appellees conceded that Ohio's ballot-affirmation requirement imposes a lesser burden on voters than Ohio's precinct requirement. In light of Ohio's similar signature requirements for casting regular ballots with proper identification, absentee ballots, and issue petitions, *see* O.R.C. §§ 3509.03, 3509.05, 3519.01, 3505.18, we agree. Ohio's legitimate interests in election oversight and fraud prevention easily justify the minimal, unspecified burden asserted by the SEIU plaintiffs. Because the SEIU plaintiffs have not shown a likelihood of success on the merits, we reverse the preliminary injunction's deficient-affirmation remedy.

## IV. THE CONSENT DECREE (Appeal 12-3916)

### A. *Applicability of Rule 60(b)*

Ohio and the Secretary argue that Rule 60(b) does not apply to this case because (1) Ohio election law does not provide exceptions for the counting of any wrong-precinct or deficient-affirmation ballots, and the consent decree made no predicate findings of a constitutional violation; (2) the consent decree, by its own terms, is modifiable for "good cause"; and (3) this court already ruled that the consent decree is not a "final judgment." They claim that because Ohio and the Secretary entered an agreement with the plaintiffs that they now contend violates Ohio law, it is void, and Rule 60(b) does not apply to a request to vacate it. We hold that Rule 60(b) applies to this case and that Ohio and the Secretary have not sustained their burden under Rule 60(b). Thus, we affirm the district court's denial of the request to vacate the consent decree.

Ohio and the Secretary argue that if a consent decree requires a state to take actions that violate state law, and no predicate federal constitutional violation has been

established, Rule 60(b) does not apply. They cite a number of cases for this proposition, but all of them involved either third parties challenging a consent decree reached by others, or review of legal challenges to a consent decree on direct appeal.**12** Rule 60(b) would not have been implicated in these cases because those challenging the validity of the decrees were either not "parties," as required by Rule 60(b), or properly raised their argument on direct appeal in the underlying litigation. None involved a party contesting the validity of a decree to which it previously consented after the decree became final and the time for direct appeal passed. In the only case we are aware of addressing facts similar to those posed here, the Second Circuit applied Rule 60(b) to deny the government's request for relief from the consent decree. *See Congregation Mischknois Lavier Yakov, Inc. v. Bd. of Trs. for Village of Airmont*, 301 F. App'x 14, 15 (2d Cir. 2008) (rejecting defendant's argument "inasmuch as the settlement and order were contrary to state law, they were void and should be vacated").

Although they do not acknowledge it, Ohio and the Secretary make an argument properly characterized as falling under Rule 60(b)(4). Rule 60(b)(4) permits final judgments to be lifted if "void." But the Supreme Court has held that nothing short of a "jurisdictional error" or "a violation of due process" justifies relief under Rule 60(b)(4). *See United Student Aid Funds, Inc. v. Espinosa*, 130 S. Ct. 1367, 1377 (2010). Neither is alleged or shown here. *Espinosa* was itself a case where a final judgment enshrined a violation of federal law, and the corporation challenging that judgment under Rule 60(b) did nothing to address this problem in a timely fashion. *Id.* at 1380. Ohio and the Secretary contend that the consent decree was flawed "when it was entered."

---

**12***See St. Charles Tower, Inc. v. Kurtz*, 643 F.3d 264, 266 (8th Cir. 2011) (appeal by intervenors who were not parties to a consent decree between plaintiffs and defendant zoning board); *League of Residential Neighborhood Advocates v. City of L.A.*, 498 F.3d 1052, 1053 (9th Cir. 2007) (lawsuit brought by neighbors of a synagogue that entered a consent decree with the defendant in a separate case); *Cleveland Cnty. Ass'n for Gov't by the People v. Cleveland Cnty. Bd. of Comm'rs*, 142 F.3d 468, 471 (D.C. Cir. 1998) (lawsuit brought by third-party voters group challenging consent decree entered by NAACP and the defendant); *Keith v. Volpe*, 118 F.3d 1386, 1389–90 (9th Cir. 1997) (appeal of an injunction entered pursuant to a consent decree by a businessman who was not a party to the decree); *Perkins v. City of Chi. Heights*, 47 F.3d 212, 214 (7th Cir. 1995) (appeal by two of the named plaintiffs in a class action objecting to a consent decree reached by the remaining named plaintiffs and the defendant); *People Who Care v. Rockford Bd. of Educ. Sch. Dist. No. 205*, 961 F.2d 1335, 1336 (7th Cir. 1992) (appeal by a teacher's union that was not a party to a consent decree between a school district and various citizens' groups); *Kasper v. Bd. of Election Comm'rs of the City of Chi.*, 814 F.2d 332, 338–39 (7th Cir. 1987) (appeal by plaintiffs dissatisfied with a consent decree reached by intervening plaintiffs and defendants).

(Appellant's Br. at 27.) Nonetheless, they agreed to and were signatories to the consent decree and did not begin challenging it as "void" until more than a year after the fact. "Where, as here, a party [has notice of a violation of law enshrined in a final judgment] and fails to object to [it] before the time for appeal expires, that party has been afforded a full and fair opportunity to litigate, and the party's failure to avail itself of that opportunity will not justify Rule 60(b)(4) relief." *Espinosa*, 130 S. Ct. at 1380. Therefore, we agree with the plaintiffs that Rule 60(b)(4) governs challenges to an allegedly "void" consent decree and that Ohio and the Secretary have not met the high threshold necessary to bring such a challenge.

The consent decree provides that "[a]ny of the parties may file a motion with the Court to modify, extend or terminate this Decree for good cause shown." (Consent Decree at V(11).) Ohio and the Secretary argue that this clause constitutes a "waiver" of the strictures of Rule 60(b). It does not. While a consent decree "embodies an agreement of the parties and thus in some respects is contractual in nature," it is nonetheless subject to Rule 60(b) because it is "a judicial decree that is subject to the rules generally applicable to other judgments and decrees." *Rufo v. Inmates of Suffolk Cnty. Jail*, 502 U.S. 367, 378 (1992). The words "good cause shown" do not upset this general presumption. Even when consent decrees explicitly provide instructions for their own modification, Rule 60(b) governs. *Cleveland Firefighters for Fair Hiring Practices v. City of Cleveland*, 669 F.3d 737, 741 (6th Cir. 2012) ("[A] district court is not merely an instrument of a consent decree or of the parties' stipulations with respect to it," and termination of a decree must be "lawful given not only the decree's terms, but also the broader legal rules that govern consent decrees"). Moreover, while we review the district court's interpretation of a consent decree it approves *de novo*, we have applied "deferential *de novo*" review to the district court's interpretation of a consent decree it supervised and approved. *Sault Ste. Marie Tribe of Chippewa Indians v. Engler*, 146 F.3d 367, 371–72 (6th Cir. 1998) (emphasis added). The district court's conclusion that Rule 60(b) applied to this dispute removes any doubt that the "good cause shown" language in the consent decree reaffirms Rule 60(b)'s applicability, rather than circumventing it.

The consent decree explains that it is "final and binding among and between [the parties] as to the issues raised in the Plaintiffs' Complaint and Supplemental Complaint, and the matters resolved in this Decree." (Consent Decree, preamble.)  Nonetheless, Ohio and the Secretary argue that this court's recent opinion in *NEOCH v. Husted*, --- F.3d ----, 2012 WL 3734369 (6th Cir. Aug. 30, 2012), establishes that the consent decree is not a "final judgment" subject to Rule 60(b).  That decision addressed whether the plaintiffs, by entering into the consent decree, waived their right to petition for supplemental attorney fees and costs pursuant to 42 U.S.C. § 1988(b).  *NEOCH*, 2012 WL 3734369, at *4.  We found that the consent decree did not constitute such a waiver. *Id.* at *8.

Contrary to the position taken by Ohio and the Secretary, that ruling had no bearing on whether or not the consent decree was a "final order, judgment, or proceeding" for Rule 60(b) purposes.  Our case law interpreting § 1988(b) in the context of settlement agreements has focused on whether or not "the parties intended the settlement to be a *final disposition* of all claims," or if the agreement contemplates a future motion for such fees by the "prevailing party."  *See Jennings v. Metro. Gov't of Nashville*, 715 F.2d 1111, 1113–14 (6th Cir. 1983) (emphasis added).  But in either case, the underlying resolution of the plaintiff's claims that supports the request for fees is a "final" one for Rule 60(b) purposes. Entitlement to such fees is determined by whether a party "'succeed[s] on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit.'"  *Phelan v. Bell*, 8 F.3d 369, 373 (6th Cir. 1993) (quoting *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983)).  It is not possible to apply for "prevailing party" fees until a form of "judicially-sanctioned relief" has been provided. *Sierra Club v. Hamilton Cnty. Bd. of Cnty. Comm'rs*, 504 F.3d 634, 656 (6th Cir. 2007).  The consent decree's explicit statement that it is "final and binding" as to the "matters resolved in this decree" erases any doubts on this point.  Accordingly, the recent decision in *NEOCH* does not alter our views regarding Rule 60(b)'s applicability in this context.

*B. Analysis Under Rule 60(b)*

Having rejected the objections to Rule 60(b)'s applicability, our resolution of the appeal is straightforward. "We review a district court's decision to vacate a decree for an abuse of discretion." *Doe v. Briley*, 562 F.3d 777, 782 (6th Cir. 2009). Ohio and the Secretary "'bear[ ] the burden of establishing that a significant change in circumstances warrants revision of the decree.'" *Vanguards of Cleveland v. City of Cleveland*, 23 F.3d 1013, 1018 (6th Cir. 1996) (quoting *Rufo*, 502 U.S. at 760). We have already explained why the district court properly found that the consent decree is not "void" under Rule 60(b)(4). As to Rule 60(b)(5), Ohio and the Secretary advanced no argument that they were actually entitled to such relief in their opening brief, since they chose to rely solely on arguments challenging Rule 60(b)'s applicability. *See Youghiogheny & Ohio Coal Co. v. Milliken*, 200 F.3d 942, 955 (6th Cir. 1999) ("[A]rguments not raised in the proponent's opening brief on appeal are generally considered abandoned."). In their reply brief, Ohio and the Secretary argue that they have met the requirements of Rule 60(b)(5) and *Rufo* because "modification of a consent decree may be warranted when the statutory or decisional law has changed to make legal what the decree was designed to prevent." *Rufo*, 502 U.S. 367, 388 (1992); *see also Sweeton v. Brown*, 27 F.3d 1162, 1164 (6th Cir. 1994).

*Rufo* does not support Ohio and the Secretary's argument. First, *Rufo* dealt specifically with the issue of clarifying decisions of *federal* law, not *state* law, which is the only legal change asserted in No. 12-3916. Second, Ohio and the Secretary have conceded that, at best, *Painter* merely clarified preexisting Ohio law. *Rufo* is limited to genuinely unanticipated circumstances. *Id.* at 384 ("[M]odification should not be granted where a party relies upon events that actually were anticipated at the time it entered into a decree."). Third, *Rufo* acknowledged that parties can and do "settle . . . dispute[s] over the proper remedy for . . . constitutional violations that had been found by undertaking to do more than the Constitution itself requires," and that allowing the modification of decrees whenever "a clarification in the law" comes about would greatly "undermine the finality of such agreements" and "serve as a disincentive to negotiation of settlements

in institutional reform litigation." *Id.* at 388–89; *see also Northridge Church v. Charter Twp. of Plymouth*, 647 F.3d 606, 613–14 (6th Cir. 2011) ("[Rule 60(b)(5)] does not allow modification 'when it is no longer *convenient* to live with the terms of a consent decree' . . . ." (quoting *Rufo*, 502 U.S. at 383) (emphasis in *Northridge Church*)). Applying *Rufo* in this case would raise serious finality concerns, given Ohio and the Secretary's change of course on the proper law to be applied.

Moreover, even taking into account the arguments raised in the reply brief, Ohio and the Secretary have not carried their burden on two other aspects of the *Rufo* test recognized by this circuit. In addition to a "significant change in circumstances," the moving party must show that the consent decree is "onerous," "unworkable," or "detrimental to the public interest." *Heath v. DeCourcy*, 992 F.2d 630, 635 (6th Cir. 1993). Furthermore, if changes *are* anticipated, as they appeared to be in this case, the party seeking to modify the decree must show that the original decree was agreed to in good faith, that reasonable efforts at compliance were made, and that it ought to be relieved of its obligations. *Id.* Ohio and the Secretary have not attempted to make these showings, much less carry their burden on them. Accordingly, the district court did not abuse its discretion in refusing to modify the consent decree under Rule 60(b).

*C. Remaining Issues with Consent Decree*

Before concluding, we note some additional issues our ruling creates that must be resolved. While we have set aside the portion of the preliminary injunction addressing deficient-affirmation provisional ballots, the consent decree continues to mandate that some deficient-affirmation provisional ballots will be counted. This discrepancy appears to create a *Bush v. Gore* problem. Similarly, the consent decree standing on its own also raises *Bush v. Gore* issues by virtue of treating some provisional ballots differently than others. This latter concern is not purely academic, as the consent decree will be the only agreement governing these issues for Ohio's 2013 primary elections.

In the order on appeal in No. 12-4069, the district court held that the discrepancy the consent decree creates between different sets of provisional ballots formed an alternate justification for the preliminary injunction. Both Ohio and the Plaintiffs

attempted to leverage this ruling on appeal in No. 12-4069 by arguing that either none or all of these ballots ought to be counted, respectively. But the district court has never ruled on this argument in the context of a request to modify or vacate the consent decree. The NEOCH Plaintiffs did make a motion to this effect in the district court, but it was stayed pending this appeal. Moreover, the discrepancy between deficient-affirmation ballots for the November 2012 election is entirely a creature of this court's decisions, and has never been considered by the district court. Because the district court has not had an opportunity to address these issues, and decisions to modify consent decrees are generally left to the discretion of the trial court, the proper course is to remand this case so that the parties, by proper motion or agreement, may address the issue in the district court. Ohio, which has the most to lose by a remand, suggested such relief would be appropriate on appeal if such a finding were made. (Ohio Br., No. 12-4069, at 32 ("[I]f [the court] finds that the Decree *creates* a constitutional violation, it can note that as a holding, leaving the district court on remand to address that.").)

## V. CONCLUSION

For the above reasons, we AFFIRM IN PART and REVERSE IN PART the district court's preliminary injunction in appeal 12-4069. Specifically, the preliminary injunction's wrong-precinct remedy is AFFIRMED, and the deficient-affirmation remedy is REVERSED. The district court's judgment in No. 12-3916 is AFFIRMED, and the matter is REMANDED for further proceedings.